# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN BRENNAN, Derivatively on Behalf of STERICYCLE, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHARLES A. ALUTTO, DANIEL V. GINNETTI, JOSEPH B. ARNOLD, RICHARD T. KOGLER, FRANK J.M. TEN BRINK, MARK C. MILLER, JACK W. SCHULER, JOHN PATIENCE, LYNN DORSEY BLEIL, MIKE S. ZAFIROVSKI, RODNEY F. DAMMEYER, THOMAS D. BROWN, THOMAS F. CHEN, WILLIAM K. HALL, JONATHAN T. LORD, and RONALD G. SPAETH, <br><br> Defendants, <br> -and- <br><br> STERICYCLE, INC., a Delaware corporation, <br><br> Nominal Defendant. | Case No. <br><br><br><br><br><br> DEMAND FOR JURY TRIAL |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of documents produced by nominal defendant Stericycle, Inc. ("Stericycle" or the "Company") in response to an inspection demand made pursuant to 8 *Del. C.* §220 ("Section 220"), of the Delaware General Corporation Law Code, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE OF THE ACTION

1.     This is a stockholder derivative action brought on behalf of nominal defendant Stericycle against certain of its officers and directors for violation of securities law, breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of law for actions that have exposed the Company to hundreds of millions of dollars in liability for violations of state and federal law.

2.     Founded in 1989, Stericycle provides medical waste collection and disposal services for a wide variety of public, private, and government-operated medical clinics, veterinary clinics, medical labs, municipal jails, and other businesses that generate regulated medical waste.  The Company maintains the largest network of medical waste transport vehicles, collection sites, and treatment facilities in the United States.

3.     Stericycle experienced tremendous revenue growth in the last decade.

4.     Unfortunately, a significant portion of that growth was through a scheme designed to defraud the Company's customers out of substantial sums.  The scheme—implemented for many years—has resulted in hundreds of millions of dollars profits generated from unexplained charges imposed on small quantity ("SQ") producers of medical waste across the country.  The Company has a long history of litigation against is nationwide for anti-trust violations, breach of contract claims, employment and other matters.

5.     In particular, since approximately 2003, Stericycle has generated steady revenue growth by programming its internal billing and accounting software to wrongfully and repeatedly charge an 18% automatic price increase ("API") in excess of the flat rates the Company agreed to charge its customers.  This automatic increase is a blatant violation of the Company's contractual obligations.  Stericycle attempted to justify the price increases by claiming they were tied to their increased costs, and thus authorized under the terms of their contracts.  However, as explained below and admitted by key Stericycle executives, the Company imposed the price increases to meet revenue targets without any consideration of Stericycle's costs.

6.     Stericycle executed this plan by targeting SQ producers of medical waste that it deemed least likely to detect fraud, such as doctors, dentists, and veterinarians.  SQ producers who became aware of the scheme were coerced to remain customers by the Company's threat to pursue draconian "liquidated damages" against them if they canceled the contract.  For example, if a customer terminated its contract with Stericycle prior to its expiration, the contract entitles Stericycle to recover from the customer liquidated damages in the amount equal to 50% of the customer's monthly charge multiplied by the number of months remaining on the contract.

7.     Even after repeated warnings, the Board of Directors (the "Board") allowed this illegal practice to continue.  In 2010, a Stericycle employee, frustrated at seeing customers repeatedly charged uncontracted for and excessive fees, filed a Qui Tam action against the

Company.  As discussed in more detail below, Stericycle paid over $29 million to resolve the False Claims Act allegations brought against it—$2.4 million in 2013 and over $26 million in 2015.

8.      In 2013, on the heels of the first Qui Tam settlement (the "Qui Tam Settlement") SQ customers, learning the truth about Stericycle's unethical and unlawful activity, began taking legal action against the Company in the form of consumer class action lawsuits.  Over the course of the next year, Stericycle customers filed twenty-one related cases; twenty of them were eventually consolidated into *In re: Stericycle, Inc., Steri-Safe Contract Litigation*, No. 1:13-cv-05795, MDL No. 2455 (the "Consumer Action").  Despite all of the above, the wrongdoing continued.

9.      In addition to defrauding customers, defendants were misleading investors. Defendants knew, but concealed from investors, that Stericycle's results were inflated by the automatic APIs and that this business model was unsustainable.  Yet, the Company continued to issue misleading statements.

10.      In the midst of this wrongdoing, defendants Mark C. Miller ("Miller"), Jack W. Schuler ("Schuler"), Charles A. Alutto ("Alutto"), Lynn Dorsey Bleil ("Bleil"), Thomas D. Brown ("Brown"), Thomas F. Chen ("Chen"), Rodney F. Dammeyer ("Dammeyer"), William K. Hall ("Hall"), John Patience ("Patience"), and Mike S. Zafirovski ("Zafirovski") negligently made false and misleading statements in the Company's 2015 and 2016 Proxy Statements on Forms DEF 14A filed with the SEC (the "2015 Proxy" and "2016 Proxy" and, collectively, the "Proxies").  The Forms DEF 14A were filed ahead of the Company's annual stockholders' meeting.  The Proxies included stockholder proposals for an independent Chairman of the Board, which defendants Miller, Schuler, Alutto, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski asserted was unnecessary and not in the best interest of stockholders.  In connection with their efforts to dissuade stockholders to vote for an independent Chairman of the Board and to secure their own re-election to the Board, the above members of the Board asserted that they were engaged in risk oversight and that the Audit Committee exercised oversight of the Company's financial statements.

11. When Stericycle was forced to end its fraudulent practices of defrauding its customers, the Company's financial performance declined precipitously and its stock soon followed. Blaming fuel surcharges and a decline in industrial waste volumes, Stericycle adjusted its SQ growth rates and issued guidance below analyst expectations. In truth, Stericycle's financial performance was being negatively affected because SQ customers were leaving or renegotiating their contracts at lower prices. On October 22, 2015, Stericycle's stock dropped from $149.04 to $120.31 per share, while its depository shares dropped from $106.34 to 92.56. Then, on July 28, 2016, Stericycle's stock fell from $105.93 to $89.37 per share, and its depository shares fell from $84.72 to $74.59.

12. Unable to continue the charade, the Company entered into a settlement of the Consumer Action on October 26, 2017. The settlement calls for Stericycle to pay almost $300 million to the class.

13. The Company has also been harmed as a result of the Director Defendants' actions in causing the Company to repurchase over $530 million in shares of Stericycle stock at artificially inflated prices while concealing from the public that Stericycle's financial results were inflated by the automatic APIs.

14. While the Company was harmed by the Individual Defendants' wrongful conduct, certain of the defendants fared much better. Many of the Individual Defendants sold Stericycle stock at artificially inflated prices based on their knowledge of material, non-public information. In total, these insiders disposed of almost $124 million worth of their Stericycle stock at inflated price and due to their knowledge of nonpublic information.

15. As a result of the above, the defendants have substantially damaged Stericycle. Accordingly, plaintiff now brings this action.

## JURISDICTION AND VENUE

15.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of sections 10(b) and 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

16.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by District courts permissible under traditional notions of fair play and substantial justice.

17.     Venue is proper in this Court in accordance with Section 27 of the Exchange Act and 28 U.S.C. §1391 because: (i) Stericycle incorporated in this District; (ii) the Board has selected this jurisdiction for derivative cases in the Company's forum by-law; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

18. Plaintiff John Brennan was a stockholder of Stericycle at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Stericycle stockholder.

**Nominal Defendant**

19. Nominal defendant Stericycle is a Delaware corporation with principal executive offices located at 28161 North Keith Drive, Lake Forest, Illinois.  Stericycle provides regulated and compliance solutions to healthcare, retail, and commercial businesses, including the collection and processing of specialized waste for disposal and the collection of confidential information for

secure destruction.  The Company also provides a variety of training, consulting, recall/return, communication and compliance services.  Stericycle operates integrated regulated waste management networks in the United States and twenty-one other countries.  The Company's worldwide networks include a total of 252 processing facilities, 340 transfer sites, other service facilities, and three landfills.  Stericycle employs more than 25,000 people worldwide.

**Defendants**

20.    Defendant Alutto is Stericycle's President and Chief Executive Officer and has been since January 2013 and a director and has been since November 2012.  Defendant Alutto was also Stericycle's President, Stericycle USA from January 2010 to January 2013, and also held various other positions with the Company from May 1997 to January 2010.  Defendant Alutto knowingly, recklessly, or with gross negligence: (i) caused or allowed Stericycle to impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) caused or allowed Stericycle to make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  He also negligently issued the misleading Proxies.  Defendant

21.    Alutto breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  While in possession of material, nonpublic information concerning Stericycle's true business health, defendant Alutto sold 39,500 shares of his stock for $4,668,492.24 in proceeds.  Stericycle paid defendant Alutto the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation[(A)] | All Other Compensation | Total |
|------|--------|---------------|--------------|---------------------------------------------|------------------------|-------|
| 2016 | $585,000 | $2,136,579 | $780,840 | $112,978 | $2,000 | $3,617,397 |
| 2015 | $488,269 | $2,510,200 | - | $465,327 | $1,750 | $3,465,546 |
| 2014 | $379,615 | $2,532,320 | - | $721,875 | $1,750 | $3,635,560 |
| 2013 | $348,077 | $3,176,224 | - | $513,215 | $1,750 | $4,039,266 |

22.   Defendant Daniel V. Ginnetti ("Ginnetti") is Stericycle's Executive Vice President and Chief Financial Officer and has been since August 2014.   Defendant Ginnetti was also Stericycle's Vice President of Corporate Finance from at least October 2013 to August 2014, and also held various other positions with the Company from 2003 to at least October 2013.   Defendant Ginnetti knowing, recklessly, or with gross negligence: (i) caused or allowed Stericycle to impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) caused or allowed Stericycle to make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.   Defendant Ginnetti breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.   While in possession of material, nonpublic information concerning Stericycle's true business health, defendant Ginnetti sold 32,184 shares of his stock for $3,890,361.50 in proceeds.

Stericycle paid defendant Ginnetti the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation[(A)] | All Other Compensation | Total |
|------|--------|---------------|--------------|---------------------------------------------|------------------------|-------|

| 2016 | $380,000 | $903,940 | $330,249 | $48,925 | $2,000 | $1,665,114 |
| 2015 | $346,923 | $1,026,900 | - | $234,871 | $1,750 | $1,610,444 |
| 2014 | $275,385 | $478,200 | - | $187,200 | $1,750 | $942,535 |

23.     Defendant Joseph B. Arnold ("Arnold") is Stericycle's Chief Operating Officer and has been since January 2015 and Executive Vice President and has been since April 2014. Defendant Arnold was also Stericycle's President, Stericycle USA/Canada from April 2014 to January 2015, and also held various other positions with the Company from April 2005 to April 2014.  Defendant Arnold knowingly, recklessly, or with gross negligence: (i) caused or allowed Stericycle to impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) caused or allowed Stericycle to make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  Defendant Arnold breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  While in possession of material, nonpublic information concerning Stericycle's true business health, defendant Arnold sold 13,750 shares of his stock for $1,813,641.45 in proceeds. Stericycle paid defendant Arnold the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation(A) | All Other Compensation | Total |
| --- | --- | --- | --- | --- | --- | --- |
| 2016 | $380,000 | $903,940 | $330,249 | $48,925 | $2,000 | $1,665,114 |
| 2015 | $343,077 | $1,026,900 | - | $234,871 | $1,750 | $1,606,598 |

23.     Defendant Richard T. Kogler ("Kogler") is Stericycle's Senior Vice President, International and has been since at least January 2015.  Defendant Kogler was also Stericycle's

Chief Operating Officer and Executive Vice President from January 1999 to December 2014. Defendant Kogler knowingly, recklessly, or with gross negligence: (i) caused or allowed Stericycle to impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) caused or allowed Stericycle to make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  Defendant Kogler breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  While in possession of material, nonpublic information concerning Stericycle's true business health, defendant Kogler sold 174,253 shares of his stock for $19,854,307.20 in proceeds.

Stericycle paid defendant Kogler the following compensation as an executive:

| Year | Salary | Bonus | Option Awards | All Other Compensation | Total |
|------|--------|-------|---------------|------------------------|-------|
| 2014 | $331,000 | | $1,191,680 | $1,750 | $2,026,430 |
| 2013 | $307,269 | | $1,482,238 | $1,750 | $2,153,733 |
| 2012 | $296,631 | | $1,519,601 | $1,750 | $2,139,826 |
| 2011 | $275,919 | $354,578 | $1,262,355 | $1,750 | $1,894,602 |
| 2010 | $259,401 | $344,250 | $991,439 | $1,750 | $1,596,840 |
| 2009 | $229,473 | $238,416 | $680,393 | $1,750 | $1,150,032 |
| 2008 | $227,776 | $256,248 | $514,669 | $1,500 | $1,000,193 |
| 2007 | $222,789 | $250,638 | $506,793 | $1,500 | $981,720 |
| 2006 | $222,789 | $217,219 | $474,247 | $1,500 | $915,755 |
| 2005 | $222,789 | $91,900 | $1,465,600 | $1,500 | $1,781,789 |
| 2004 | $231,358 | $116,699 | $1,577,991 | $1,500 | $1,927,548 |
| 2003 | $221,000 | $97,335 | $1,463,009 | $1,500 | $1,782,844 |

24.     Defendant Frank J.M. ten Brink ("ten Brink") is Stericycle's Senior Vice President, Mergers and Acquisitions and has been since August 2014.   Defendant ten Brink was also Stericycle's Chief Financial Officer, Chief Administrative Officer, and Executive Vice President from June 1997 to August 2014.   Defendant ten Brink knowingly, recklessly, or with gross negligence: (i) caused or allowed Stericycle to impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) caused or allowed Stericycle to make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.   Defendant Ten Brink breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.   While in possession of material, nonpublic information concerning Stericycle's true business health, defendant ten Brink sold 222,635 shares of his stock for $25,467,730.84 in proceeds.   Stericycle paid defendant ten Brink the following compensation as an executive:

| Year | Salary | Option Awards | Non-Equity Incentive Plan Compensation[(A)] | All Other Compensation | Total |
|------|--------|---------------|---------------------------------------------|------------------------|-------|
| 2014 | $266,577 | $1,191,680 | $292,958 | $1,750 | $1,752,965 |
| 2013 | $307,269 | $1,482,238 | $362,476 | $1,750 | $2,153,733 |

25.     Defendant Miller is Stericycle's Chairman of the Board and has been since May 2016 and a director and has been since May 1992.   Defendant Miller was also Stericycle's Executive Chairman of the Board from January 2013 to May 2016, Chief Executive Officer from

May 1992 until January 2013, and Chairman of the Board from August 2008 until January 2013. Defendant Miller knowingly or recklessly caused or allowed Stericycle to: (i) impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  He also negligently issued the misleading Proxies.  Defendant Miller breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  While in possession of material, nonpublic information concerning Stericycle's true business health, defendant Miller sold 368,461 shares of his stock for $40,646,273.27 in proceeds.  Stericycle paid defendant Miller the following compensation as an executive:

| Year | Salary | Option Awards | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|---------------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $50,000 | $473,940 | $150,123 | - | - | $674,063 |
| 2015 | $147,462 | $753,060 | - | $87,194 | $1,750 | $989,466 |
| 2014 | $142,000 | $766,080 | - | $191,700 | $1,750 | $1,101,530 |
| 2013 | $144,423 | $1,164,616 | - | $149,917 | $1,750 | $1,460,706 |

26.    Defendant Schuler is Stericycle's Lead Director and has been since August 2008, and a director and has been since January 1990.  Defendant Schuler was also Stericycle's Chairman of the Board from January 1990 until August 2008.  Defendant Schuler knowingly, recklessly, or with gross negligence caused or allowed Stericycle to: (i) impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were

tied to increased costs; and (ii) make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  He also negligently issued the misleading Proxies.  Defendant Schuler breached his fiduciary duties and violated section 10(b)5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  While in possession of material, nonpublic information concerning Stericycle's true business health, defendant Schuler sold 10,224 shares of his stock for $1,017,430.44 in proceeds.

27.    Defendant Patience is a Stericycle director and has been since March 1989. Defendant Patience is a member of Stericycle's Audit Committee and has been since at least April 2013.  Defendant Patience knowingly or recklessly caused or allowed Stericycle to: (i) impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  He also negligently issued the misleading Proxies.  Defendant Patience breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  While in possession of material, nonpublic information concerning Stericycle's true

business health, defendant Patience sold 110,624 shares of his stock for $13,438,003.82 in proceeds.

28.    Defendant Brown is a Stericycle director and has been since May 2008.  Defendant Brown was a member of Stericycle's Audit Committee from at least April 2013 to at least April 2014.  Defendant Brown knowingly or recklessly caused or allowed Stericycle to: (i) impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  He also negligently issued the misleading Proxies.  Defendant Brown breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.

29.    Defendant Chen is a Stericycle director and has been since May 2014.  Defendant Chen is a member of Stericycle's Audit Committee and has been since at least 2014.  Defendant Chen knowingly or recklessly caused or allowed Stericycle to: (i) impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  He also negligently issued the misleading

00540145

Proxies.   Defendant Chen breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.

30.    Defendant Bleil is a Stericycle director and has been since May 2015.  Defendant Bleil was a member of Stericycle's Audit Committee from May 2015 to at least April 2016. Defendant Bleil knowingly or recklessly caused or allowed Stericycle to: (i) impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  She also negligently issued the misleading Proxies.  Defendant Bleil breached her fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices she knew were artificially inflated by her misleading statements and omissions.

31.    Defendant Dammeyer was a Stericycle director from January 1998 to May 2017. Defendant Dammeyer was the Chairman of Stericycle's Audit Committee and a member of that committee from at least April 2013 to May 2017.  Defendant Dammeyer had knowingly or recklessly caused or allowed Stericycle to: (i)  impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) to make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful

lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  He also negligently issued the misleading Proxies.  Defendant Dammeyer breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  While in possession of material, nonpublic information concerning Stericycle's true business health, defendant Dammeyer sold 70,440 shares of his stock for $8,614,456.85 in proceeds.

32.     Defendant Hall was a Stericycle director from August 2006 to May 2017.  Defendant Hall was a member of Stericycle's Audit Committee from at least April 2013 to at least April 2014.  Defendant Hall knowingly or recklessly caused or allowed Stericycle to: (i) impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  He also negligently issued the misleading Proxies.  Defendant Hall breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.  While in possession of material, nonpublic information concerning Stericycle's true business health, defendant Hall sold 28,995 shares of his stock for $3,353,506.52 in proceeds.

33.     Defendant Zafirovski is a Stericycle director and has been since November 2012.  Defendant Zafirovski knowingly or recklessly caused or allowed Stericycle to: (i) impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to

justify by claiming they were tied to increased costs; and (ii) make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  He also negligently issued the misleading Proxies.  Defendant Zafirovski breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.

34.    Defendant Jonathan T. Lord ("Lord") was a Stericycle director from August 2004 to May 2014.  Defendant Lord knowingly or recklessly caused or allowed Stericycle to: (i) impose 18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.  Defendant Lord breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.   While in possession of material, nonpublic information concerning Stericycle's true business health, defendant Lord sold 6,040 shares of his stock for $664,400 in proceeds.

35.    Defendant Ronald G. Spaeth ("Spaeth") was a Stericycle director from May 2008 to May 2014.  Defendant Spaeth knowingly or recklessly caused or allowed Stericycle to: (i) impose

18% APIs in blatant violation of the Company's contractual obligations, which Stericycle attempted to justify by claiming they were tied to increased costs; and (ii) make improper statements in Stericycle's press releases and public filings concerning: (a) Stericycle's failure to follow the terms of its customer contracts; (b) Stericycle's scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual cost and without notice to its customers; (c) the useful lives of Stericycle's customer relationships; and (d) the Company's artificially high gross margins as a result of its wrongful conduct.   Defendant Spaeth breached his fiduciary duties and violated section 10(b)-5 of the Exchange Act by causing Stericycle to repurchase its stock on the open market at prices he knew were artificially inflated by his misleading statements and omissions.   While in possession of material, nonpublic information concerning Stericycle's true business health, defendant Spaeth sold 4,000 shares of his stock for $462,087.60 in proceeds.

36.   The defendants identified in ¶¶20-24 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶20, 25-35 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶27-32 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶2-27, 31-32, 34-35 are referred to herein as the "Insider Trading Defendants."   Collectively, the defendants identified in ¶¶20-35 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

37.   By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Stericycle and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Stericycle in a fair, just, honest, and equitable manner.  The Individual Defendants

were and are required to act in furtherance of the best interests of Stericycle and not in furtherance of their personal interest or benefit.

38.   To discharge their duties, the officers and directors of Stericycle were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Stericycle were required to, among other things:

(a)   ensure the Company's contracts were executed and carried out pursuant to their terms and applicable law;

(b)   ensure the Company filed accurate financial and operational information with the SEC and refrain from engaging in deceptive and fraudulent conduct;

(c)   conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, to not act in a manner that results in their personal unjust enrichment, and to maximize the value of the Company's stock; and

(d)   remain informed as to how Stericycle conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

**Breaches of Duties**

39.   The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Stericycle, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

40. The Individual Defendants breached their duties of care and loyalty by allowing defendants to cause, or by themselves causing, the Company to engage in a fraudulent scheme to extract massive amounts of money from its unsuspecting customers all for the benefit of lining the executive defendants' pockets that resulted in myriad lawsuits and hundreds of millions of dollars in settlements that caused and continue to cause Stericycle to incur substantial damage.

41. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Stericycle, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. As a result, and in addition to the damage the Company has already incurred, Stericycle has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

42. In addition to these duties, the Audit Committee Defendants, defendants Patience, Bleil, Dammeyer, Brown, Chen, and Hall, owed specific duties to Stericycle to: (i) "review … with the Company's counsel any legal and regulatory matters that may have a material effect on the Company's financial statements, operations, compliance policies and programs;" (ii) "recommend to the Board of Directors that the audited financial statements be included in the Company's annual report on Form 10-K;" (iii) "review with management significant risks and exposures identified by management, the internal auditors or the independent accountants, and management's steps to address these risks;" (iv) "review with management, the independent accountants and the senior internal auditor (i) the Company's internal controls…;" (v) "review and discuss with management … the Company's quarterly financial statements;" and (vi) "discuss with management … (i) any significant deficiencies in the design or operation of internal controls and any material weaknesses identified, (ii) any fraud involving management or other employees who have a significant role in the Company's internal controls and (iii) any employee complaints or

published reports that raise material issues regarding the Company's accounting, internal accounting controls or auditing matters."

43.     Moreover, the charter provides that "[a]fter the completion of the annual audit examination (and before the Company's annual report on Form 10-K is filed with the SEC) [the audit committee is to] review with management … (3) the appropriateness and acceptability of the accounting principles, financial disclosures, and underlying estimates used in the Company's financial statements, including (i) critical accounting policies and practices and (ii) alternative treatments within generally accepting accounting principles for policies and practices relating to material items that have been discussed with management; (4) any significant difficulties or Case disputes with management encountered during the course of the audit and management's response; … (7) any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies."

44.     Finally, the audit committee charter requires its members "[t]o discuss with management and the independent accountants: (i) any significant deficiencies in the design or operation of internal controls and any material weaknesses identified, (ii) any fraud involving management or other employees who have a significant role in the Company's internal controls and (iii) any employee complaints or published reports that raise material issues regarding the Company's accounting, internal accounting controls or auditing matters."

45.     The audit committee charter in effect since September 2015, imposes the same duties on the Audit Committee Defendants.

**Stericycle's Code of Business Conduct**

46.     According to Stericycle's Business Conduct Guidelines, in effect since at least March 19, 2014, "Stericycle expects all team members to obey the law and to act ethically."

47.     The first section in Stericycle's Business Conduct Booklet is entitled "Communications Channels," which encourages employees to report any unlawful or unethical situations to a manager, Human Resources, or "any member of senior management (CEO, COO, CFO, EVP)."  Stericycle's whistleblower complied with this policy when she reported her concerns about the Company's API policy to her supervisor.  In response to the whistleblower's concerns, a senior executive admitted to her that Stericycle was subjecting federal customers to improper price increases via its automated billing program.

48.     Another section in Stericycle's Business Conduct Booklet is entitled "Compliance with the Law," which states: "The team members of Stericycle shall comply with the laws and highest standards of business ethics and conduct in every country in which Company does business."  Notwithstanding this statement, as shown herein, Stericycle's team members, including its officers, failed to "comply with the laws and highest standards of business ethics and conduct…."

49.     Feigning concern for stockholders, the Business Conduct Booklet also includes an "Ethical Flow Chart" that encourages employees to evaluate their actions based on whether: (i) the proposed action is legal; (ii) it maximizes stockholder value; and (iii) the action is ethical. However, Stericycle's officers breached their duties to stockholders when they failed to confer with the flow chart and ignored complaints by Company employees about the way the Company treated its customers.

50.     In September 2016, Stericycle disseminated a new Statement of Ethics and Code of Conduct.  Of interest, is the new statement:

> The future of Stericycle is dependent upon not only our results, but also the manner and means by which those results are obtained. It is important that all of us individually, and as a company, aspire and achieve a standard of ethics that is beyond the expectations of our customers. We must not only be acting ethically in all our daily activities but, we must at all times be perceived as acting ethically by those with whom we work and with whom we do business.

> No one at Stericycle is ever expected to commit or condone an illegal or unethical act, or to instruct other team members to do so – not for efficiency – not for results – not for profits – not for any reason at all. We give honest answers, honor our

00540145

commitments and keep our promises. If we make a mistake, we do not pass it off or cover things up. We focus on what is the right thing to do to accomplish our objectives. We make tough decisions and live by our rules.

* * *

This Code is an important part of Stericycle's Core Values and reflects our commitment to ethical business practices and regulatory compliance. It summarizes the principles and policies that guide our business activities. This Code is not meant to replace our detailed policies: it supplements our current policies and procedures, and is a statement of our principles in a number of important areas that affect all our daily business operations.

Because rapid changes in our industries constantly present new ethical and legal issues, no set of guidelines should be considered the absolute last word under all circumstances. We encourage you to utilize our Core Values in making business decisions. Please study this Code and commit yourself to upholding its letter and spirit at all times. Our reputation belongs to all of us. We need your help in maintaining it and making it stronger. If you have any questions about interpreting or applying the Code, or about policies and procedures published by Stericycle, it is your responsibility to consult your manager. A violation of any Stericycle policies and procedures can result in disciplinary action, up to and including termination.

51. The above seems to be a direct response to address the allegations of wrongdoing being asserted by the myriad complaints against the Company and the conduct alleged herein. It speaks of "the manner and means by which … results are obtained" and states there is no expectation that employees commit illegal or unethical acts for the sake of profits. By the time this edict was disseminated, the harm had already been done.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

52. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

53. During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) impose excessive APIs

on unsuspecting customers for the sole reason of increasing the Company's bottom line; (ii) deceive the investing public, including stockholders of Stericycle, regarding the Individual Defendants' management of Stericycle's operations and fraudulently elicit excessive unauthorized fees from its customers in order to increase profits; (iii) artificially inflate Stericycle's stock price while many of the Individual Defendants made illegal lucrative sales of Company stock based on material, nonpublic information; and (iv) enhance the Individual Defendants' executive and directorial positions at Stericycle and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

54.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment.

55.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly violate its own contract terms and internal policies for their own personal financial benefit. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

56.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

**FACTUAL BACKGROUND**

57.    Incorporated in 1989 on the heels of the enactment of the Medical Waste Tracking Act of 1988 ("MWTA"), Stericycle provides medical waste collection and disposal services for a wide variety of public, private, and government-operated medical clinics, veterinary clinics, medical labs, municipal jails, and other businesses that generate regulated medical waste.

58.    The MWTA and the Environmental Protection Agency rules promulgated thereunder regulate how generators of medical waste must disclose and dispose of the hazardous waste they generate.

59.    After the MWTA was enacted, demand for third party medical waste disposal services—such as those Stericycle provides—increased.  Small generators of medical waste that were unable to dispose of the waste in-house had to enlist the services of third parties to take their infectious waste to approved treatment facilities.

60.    The medical waste market was initially highly competitive.  From 1988 through the early 1990s, many garbage and waste collection companies moved to extend the scope of their operations into the medical waste market.  The two largest of these were owned by Waste Management, Inc. ("WMI") and Browning Ferris Industries ("BFI"), the two dominant firms in municipal solid waste disposal.  However, both WMI and BFI exited the medical waste market in 1996 and 1999, respectively, and Stericycle eventually purchased both companies' waste management assets, tripling the size of Stericycle and eliminating its only other national competitors.  Since 1993, Stericycle has completed 299 acquisitions in the U.S. and internationally.

61.    Over the course of Stericycle's rapid growth, several antitrust regulators commenced actions due to the Company's anticompetitive and monopolistic conduct.  The Utah Attorney General brought antitrust litigation against Stericycle when another medical waste company alleged that Stericycle refused to incinerate its medical waste.  The medical waste company's

allegations brought to light that Stericycle and BFI had conspired in 1997 to divide their markets and enter into a noncompete agreement.  In January 2003, Stericycle entered into a settlement with the Utah Attorney General stemming from these allegations.  The terms of the settlement required Stericycle to enhance competition, including providing incinerating treatment services to third-party haulers at the Company's Salt Lake treatment facility.  In addition, Stericycle could no longer hold its customers to long-term contracts.  A similar action was brought by the Arizona Attorney General, which Stericycle resolved in August 2003 by agreeing to terms similar to the Utah settlement.

62.    Further, when acquiring Healthcare Waste Solutions Inc. ("HWS") in April 2011, the New York Attorney General brought an antitrust lawsuit against Stericycle to challenge the acquisition.  That case resulted in Stericycle's agreement to sell HWS's medical waste transfer station in the Bronx to a credible competitor to help keep prices down and the quality of services high.

63.    Stericycle has taken advantage of the lack of competition in the medical waste disposal market by imposing excessive fees.  As explained in further detail below, a Stericycle whistleblower, Stericycle customers, the U.S. Department of Justice, and the State of New York have brought suit against Stericycle—some obtaining large settlements—for its oppressive contract terms and withholding of accurate pricing data from its customers that resulted in improper APIs.  Despite the growing number of lawsuits brought against it and the increasing monetary damages it has been forced to pay as a result, Stericycle's officers and directors continued to harm the Company by maintaining these unlawful and deceptive business practices.  The damages being incurred by the Company are depleting it of its financial resources and diminishing stockholder value.

## STERICYCLE'S CONTRACT TERMS

64.     Stericycle requires its customers to execute its standardized Stericycle Steri-Safe Service Agreement ("Service Agreement").  The Service Agreement contains standardized terms and states it is governed by Illinois law.

65.     The first page of the Service Agreement typically identifies the: (i) customer; (ii) contract number; (iii) description of the "STERI-SAFE PROGRAM BENEFITS," which articulates container size, the number of annual stops at the customer's location, fees for additional stops, etc.; and (iv) price.  The price is the amount Stericycle is authorized to charge its customers. Customers believe that the price shown on the first page is fixed and represents a flat monthly fee. The Service Agreement contains no indication or breakdown of how much of the monthly fee is allocated to labor, energy, or regulatory costs, or other items of overhead.

66.     The second page of the Service Agreement provides that Service Agreement automatically renews for successive terms equal to the original term unless either party gives 60 days' notice, in writing, during the six months prior to the renewal date of its desire to terminate the agreement.  Further, the Service Agreement states that if a customer terminates the contract prior to its expiration, Stericycle has the right to recover from the customer liquidated damages in the amount equal to 50% of the customer's average monthly charge multiplied by the number of months remaining on the term.

67.     Buried in the "Billing" section on the second page, the Service Agreement states,

"Notwithstanding any limit to adjust the contract price, Stericycle reserves the right to further adjust the amounts payable and due to Stericycle for fees including, but not limited to environmental protection, compliance, waste management, or safety."  As a result, API fees appear on invoices as fees for fuel, labor, insurance, or regulatory requirements, such as "EPA."

68.   In the "Terms and Pricing" section on the second page of the Service Agreement it states, "Stericycle reserves the right to adjust the contract price to account for operational changes it implements to comply with documented changes in law, to cover increases in the cost of fuel, insurance, or residual disposal, or to otherwise address cost escalation."

## STERICYCLE'S BUSINESS MODEL DEPENDS ON SYSTEMATIC
## AND UNLAWFUL AUTOMATIC PRICE INCREASES

69.   Stericycle divides its customer base into two groups: (i) large quantity ("LQ") customers, such as hospitals, blood banks, and pharmaceutical manufacturers; and (ii) SQ customers, such as outpatient medical clinics, medical and dental offices, and veterinary offices.

70.   SQ customers are the primary driver of the Company's financial performance and account for revenues at a much higher gross margin than LQ customers.  For instance, on a conference call discussing the Company's financial results for the second quarter 2013, defendant Kogler stated that at the end of the second quarter, Stericycle had 550,000 accounts, of which 532,000 were SQ.  Defendants explained to investors that "the basis for the higher gross margins" for SQ customers was that "when small-quantity regulated waste customers understand the potential risks of failing to comply with applicable regulations, they appreciate the value of the services that we provide."  The Company described SQ contracts as offering a "Flat Monthly Fee" with limited circumstances under which Stericycle could increase the fees it charged customers.

71.   In reality, since at least 2002, Stericycle has generated steady revenue growth by programming its internal billing and accounting software to wrongfully and repeatedly charge an 18% API in violation of the flat rates the Company agrees to charge its customers, and in blatant violation of its contractual obligations to its customers.

72.   Stericycle does not disclose to its customers that though they agreed to a fixed contract price, the Company's policy and practice was to routinely increase the contract price by implementing APIs and charging extra fees.  Stericycle's contract states clear limitations under

which it may increase its fees – "environmental protection, compliance, waste management, or safety," and to cover "operational changes … implement[ed] to comply with documented changes in law, to cover increases in the cost of fuel, insurance, or residual disposal, or to otherwise address cost escalation."  Notwithstanding, Stericycle's internal accounting system is designed to *automatically* track and impose 18% increases during a calendar year, and often times more frequently, such as at six or ninth month intervals, in violation of the Service Agreement's contractual terms.  A reasonable customers' reading of the Service Agreement would not indicate that the API policy as implemented by the Company is authorized because the extra fees and charges are in no way tied to any particular cost increase imposed on Stericycle.

73.    Stericycle customers are never told that additional charges are being added to their bills nor informed of the reason for their increased fees.  When Stericycle imposes an API, it simply issues an invoice to the customer for the new inflated price without explanation.  This makes it difficult, if not impossible, for customers to discover that the fee increases were unjustified.

74.    The Company knew that customers were unaware of the reasons for the API increases.  In October 2015, Tara Bender ("Bender"), former Stericycle billing manager, was deposed in the Consumer Action.  According to her testimony, Stericycle's automatic price increases were a "behind-the-scenes program that … automatically push the pricing to the customers' accounts."  **Pg. 52**.[1]  This policy had been in effect since at least July 2003, when SQ customers were incurring annual automatic price increases of 18% "implemented on the one-year anniversary of an account."  **Pg. 54**.

75.    Bender explained that Stericycle's systematic and deliberate practice of raisings its fees based on an 18% API bore no relationship to Stericycle's "operational changes," "documented

---

[1] All further **Pg.** __ references are to the Deposition Transcripts, unless otherwise noted.

changes in the law," or "cost escalation."  Further, Stericycle's costs did not increase by exactly 18% per year, much less every six or nine months, as some APIs were imposed.  If Stericycle was truly aligning its APIs with its costs, it would have adjusted the APIs in a manner that accommodated for the increased expenses the Company actually incurred.

76.     When government customers complained, Stericycle Vice President Patrick Cott sent an e-mail to his subordinates directing them to stop charging APIs to federal government customers.  Mr. Cott's e-mail disclosed the reason that Stericycle continued its API policy despite recognizing that it was unlawful: it generated substantial revenue for Stericycle.  Mr. Cott wrote: "Todd/Jerry – please be advised of the potential impact to the PI Impact Analysis reports that Courtenay sends to Mark/Frank/Rich each month, as these accounts will no longer be in the mix for automated PIs and fuel charges, and thus you'll lose projected PI revenue with this charge."[2]

77.     To maintain its revenue stream, Stericycle continued to impose APIs on its SQ private sector customers.  In so doing, Stericycle's revenues grew from $1.9 billion in 2012 to nearly $3 billion by the end of fiscal year 2015, with more than 63% of that revenue being generated by SQ customers.

78.     When defendants' actions were exposed, as discussed below, customers began insisting on discounts, attempted to cancel their contracts, and brought suits against the Company.

## STERICYCLE ENGAGED IN WRONGFUL BUISINESS PRACTICES

79. The Individual Defendants were aware of the increased APIs imposed on Stericycle's customers, allowed them to continue, relied on their financial impact in relaying positive financial results, ignored the allegations and impact of the Qui Tam and Consumer

---

[2] "Mark/Frank/Rich" refers to former Chief Executive Officer Miller, former Chief Financial Officer ten Brink, and former Chief Operations Officer Kogler.

Actions, and acted wrongfully on their knowledge.

**Qui Tam Complaint for False Claims Act Violations**

80.     Having gained an understanding of Stericycle's wrongful practices, on June 28, 2010, plaintiff-relator Jennifer D. Perez ("Perez") filed a First Amended Qui Tam Complaint Under Federal and State False Claims Acts on behalf of the United States of America, 14 states, and the District of Columbia.  She filed an amended complaint on July 23, 2013 ("Qui Tam Complaint").

81.     According to the Qui Tam Complaint, Stericycle employed Perez from 2004 until she was terminated on March 25, 2008.

82.     Initially, Perez was assigned to the collections department, where she saw that Stericycle was overbilling its government customers in violation of government procurement regulations.  Perez revealed that beginning in 2002, Stericycle began implementing unauthorized and unlawful APIs.  These APIs occurred as often as every nine months, causing a price increase of up to 18% during a calendar year on all Service Agreement customers, including government customers.  In addition, Stericycle added unexplained surcharges and billed customers in advance of pickups, all resulting in gross overcharges to the government accounts.

83.     Stericycle never disclosed its API program to its government customers nor was the API program authorized by Stericycle's form contracts.  Stericycle's failure to disclose its policy to increase its contract prices through APIs fraudulently induced the government, and others, to enter into these contracts.  Perez explained that Stericycle knew at the time it entered its Service Agreement that it would not abide by their terms.

84.     In 2006, Perez was promoted to the position of government specialist, responsible for preventing and resolving complaints from government customers.  In handling the complaints of various federal government departments and local state governmental units, including health departments, schools, ambulance services, prisons and jails, Perez was instructed to make false

statements to induce the government to pay the false claims.  Such false statements included: (i) telling customers that Stericycle was experiencing annual increased costs for insurance, labor, energy, or regulatory requirements as high as 30%, when their actual annual cost escalation was 3%; and (ii) telling customers that Stericycle passed only a fraction of increases to customers because the company tried to absorb as much as possible, but had to pass some increases on to the customers.  If government customers refused to pay the increased price, Stericycle's customer retention department was authorized to offer a discount on the API.

85.   Perez informed her supervisors of this wrongdoing, and they admitted that they were aware that Stericycle's price escalation practices were improper with respect to the government accounts.  In fact, a senior executive admitted to Perez in 2006 that Stericycle was subjecting federal customers to improper price increases via its automated billing program.  The senior executive also told her that the federal customers should and could be exempted from the price escalation practice.

86.   During her employment as a government specialist, Perez ultimately became aware of hundreds of false claims, which were submitted and paid for by the federal government.  Perez credited the accounts of some or all of the amounts overbilled after receiving complaints, but given the thousands of government customers Stericycle overbilled, Perez only corrected a portion of the overbilled accounts until Stericycle terminated her employment.

87.   On January 7, 2013, Stericycle settled the case initiated by Perez with the Attorney General of the State of New York for $2.4 million (the "New York Settlement").  In the New York Settlement, Stericycle admitted that "[d]uring the period January 1, 2003 through September 30, 2012, with respect to New York Government Customers, Stericycle presented invoices containing automatic price increases not authorized by contracts viz automatic periodic rate increases (automated price increases or "APIs"), that resulted in overpayment for products and services."  As part of the New York Settlement, Stericycle agreed to the following: "(a)

Stericycle shall not, in the future, apply any APIs to New York Government customers.  Any APIs applies to and paid by New York Government Customers after the period of the covered conduct shall be credited to customer accounts"; and "(b) Stericycle shall provide New York Government Customers sixty-days' written notice of and the reasons for any proposed future rate increases directed to any such customer, and should that customer who receives such notice object to the pending increase, that customer shall be permitted to opt-out, without penalty, of all remaining contractual obligations, upon thirty-days' written notice to Stericycle."  Defendant Kogler, the then Executive Vice President and Chief Operating Officer, signed the New York Settlement on behalf of Stericycle.

88.    On October 16, 2015, Stericycle settled the Qui Tam Complaint with regard to the other states for $26,750,000, plus attorneys' fees against Stericycle.

**Class Action Complaints Filed by Stericycle Customers**

89.    Though Stericycle stopped the APIs for government customers, it kept imposing APIs on nongovernment SQ customers.  Eventually, these customers began to sue Stericycle over its illegal business practices.  Since 2013, Stericycle's customers have filed no fewer than twenty-one consumer class action complaints.  Twenty of these complaints were consolidated. Yet, Stericycle's imposition of APIs continued.

90.    According to the Consumer Action, customers pay Stericycle a flat monthly or quarterly fee, the amount of which is expressly stated in the Service Agreement cover page. Despite the limitations on the circumstances under which Stericycle may increase its prices – "to comply with documented changes in the law" or to "address cost escalation" – the Consumer Action detailed how Stericycle engaged in a systematic, widespread, and deliberate practice of raising its prices without any relation to increases in costs or operational changes necessitated by changes in the law governing medical waste disposal.  In particular, Stericycle imposed an 18%

API during a calendar year on its customers, which was in no way tied to or justified by cost increases or operational changes implemented to comply with changes in the law.

91.   Stericycle did not inform its customer of its API policy.  Rather, Stericycle induced its customers into agreements by characterizing them as having stable, fixed, and set fees that customers would pay for the entire contract term.

92.   Stericycle did not notify customers when it imposed APIs or provide any notification to customers that their rates were going up.  Stericycle simply issued an invoice for the new, inflated price, without notice or justification.  In Stericycle's Answer and Affirmative Defenses to the Second Amended Consolidated Complaint [Redacted Version] Answer to the Consolidated Complaint, Stericycle admitted that its financial and accounting system referenced APIs of 18% for some SQ customers.  ¶56.[3]  Stericycle further admitted that its senior executives received monthly reports on the impact of APIs on Stericycle's overall financial performance.  ¶57.

93.   On July 28, 2017, Stericycle entered into a settlement agreement to resolve the Consumer Action and established a $295 million common fund from which to pay all compensation to members of the settlement class, attorneys' fees to class counsel, incentive awards to plaintiffs and administrative costs.

### THE OFFICERS AND DIRECTORS WERE AWARE OF STERICYCLE'S DEPENDENDCE ON APIs AND THAT THEY WERE IMPOSED  FOR THE SOLE PURPOSE OF INCREASING REVENUE

**Stericycle Executives Admittedly Used APIs to Increase Revenue with No Concern for Correlation to Actual Increased Costs**

95. Deposition testimony from the Consumer Action reveals defendants' involvement in developing and implementing APIs without regard for actual increased costs and solely to line the Company's pockets.

---

[3] All further ¶_ references are to the Answer to the Consolidated Complaint, unless otherwise noted.

**Deposition of Tara Bender—Former Billing Manager**

96.  Senior Stericycle executives were directly involved in the development and implementation of Stericycle's strategy to defraud its own customers.  Bender testified that defendant Kogler and other members of upper management were responsible for APIs.  A power point presentation she worked on stated with respect to APIs, that the "Rules [were] Driven by Rich Kogler" to "let[] everyone know that this is coming from --- it's executive managementdriven on down … they're driven from upper-level management."  **Pgs. 124-125**.

**Deposition of James Edward Buckman—Vice President of Operations**

97. In December 2015, Stericycle's Vice President of Operations, James Edward Buckman ("Buckman"), was deposed in the Consumer Action.  Buckman, whose responsibilities included forecasting revenue, "including revenue that would be gained from automated price increases." **Pg. 31**.  Reported to both defendant Arnold and defendant Kogler.  Buckman explained "automated price increases."

Q. … what's your understanding of the term "automated price increase"?

A. Automated price increase is a system-generated price increase that's applied to the customer's pricing.

Q. And for small quantity customers who have not – whose contract does not specifically state what their future pricing is going to be, unless that customer is for some reason exempted from the automated price increase process, those price increases are imposed on the customer by a function of Stericycle's billing system; is that right? A. Yes.

**Pgs. 30-31**.

98. For Buckman to forecast revenue, he needed to have an understanding of the amount or percentage of the price increases that were being imposed and the timing of those price increases. To Buckman's knowledge, while he was employed at Stericycle, the rate of

00540145

APIs had always been 18%.  **Pg. 32**.

99. As for timing, Buckman explained that in 2011 Stericycle switched the timing of the APIs from nine months to six months.  **Pg. 34**.  In elaborating on the timing of the APIs, Buckman explained:

Q. …what has that frequency been for imposing automated price increases on SQ customers?

A. That depends on the term of the contract. … if there is a stated annual rate in the contract, the automated price increase happens annually.  If there is not, it happens every six months.

Q. So, just to make sure I understand, if a contract doesn't specifically state when the customer's prices can be changed or increased, then Stericycle implements an automated price increase on the customer every six months? A. Yes.

Q. And that price increase is 18 percent?

A. Yes.

**Pgs. 32-33.**

100.    Buckman identified defendants Kogler and Arnold, Michael D. Kravets ("Kravets"), Todd Hankla, former Vice President of Finance, and Robert A. Tangredi ("Tangredi"), former Vice President & GM–Communication Solutions and former Vice President SQ Healthcare Division, as those individuals who made the decision to switch the API timing.  **Pgs. 36-38**.

101.    Buckman admitted during his deposition that there was no correlation between the 18% APIs and the costs incurred by Stericycle.  In particular, he testified:

Q. You are given a revenue target or a revenue goal that you are expected to meet … and you come up with initiatives in ways that you think you can meet that goal, correct? A. Correct.

Q. But when you are making decisions about specific initiatives, such as changing the frequency of automated price increases, you don't go back and look and say, hey, how much is … it costing us to dispose of medical waste, how much are we paying for labor or other specific cost factors when you are making those revenue decisions, do you?

A. Not specifically.

Q. … because from your point of view, whatever decisions there are about maintaining gross margins, those are made in setting the goal of revenue that you are expected to generate, right? A. Right.

Q. So, when you are deciding whether to change the frequency of automated price increases, you don't need to go back and look at those cost figures; all you need to do is make sure you hit your revenue numbers in order to make sure you keep your margins, right? A. In my role, yes.

**Pgs. 69-70.**

102. In fact, Buckman admitted that APIs are done to make up for revenue shortfall, and are not based on cost figures:

Q. Is that something that you have ever heard of or know about before, identifying a gap in Stericycle's revenue or decrease in it for whatever reason and a proposal or a decision to fill that revenue gap by imposing a fee or a surcharge? A. Yes.

**Pg. 261**.

103.　　　　When asked about Buckman's awareness of how many times this happened, Buckman responded:

A.　　A few.

Q. … So, … fees and surcharges are one of the ways that Stericycle makes sure that any decreases or changes in its revenue don't cause it to miss its targeted revenue goals, right?

A. As – as part of the sales and marketing organization, I would say yes, that we have had fee increases in order to achieve revenue goals within the sales and marketing organization.

**Pgs. 261-262**.

**Deposition of Michael D. Kravets—Former Vice President of Finance and Administration**

104.     In January 2016, Kravets, former Vice President of Finance and Administration at Stericycle, was deposed in the Consumer Action.

105.     Kravets explained that the executive team proposed APIs to meet Wall Street and Company performance metrics.  In particular, he testified:

Q. So for each of these instances that you are referring to, were these proposed automated price increases being suggested or proposed by the people on the executive team?

A. Yes.

Q. Did they ever discuss with you the reasons for their decision to propose or initiate an increase in the frequency? A. Yes.

Q. What did they tell you?

A. To meet our overall business goals.

Q. And did they describe what those overall business goals were?

A. Besides what I mentioned to you about Wall Street expectations, it was really more just company performance.

**Deposition of Richard Kogler—Former Chief Operations Officer**

106. In July 2014, defendant Kogler, former Chief Operations Officer at Stericycle, was deposed in the Consumer Action.  At his deposition, defendant Kogler had a hard time explaining Stericycle's justification for imposing APIs more frequently on one type of customer versus another.  To come up with a justification, he'd have to "speculate", because he's "not a salesperson" and it "has to do with the type of customer, their willingness to look at the price value equation for our services." **Pg. 35.**  Nevertheless, defendant Kogler admitted that he is simply concerned with revenue:

> Q. So when you've reviewed proposals made to you by sales or finance to change the frequency of automated price increases, is the willingness of the customer to accept the price increase or the timing change part of the factors that you consider in determining whether to approve that proposal?
>
> A. No, I've testified that I look at revenue.  I don't look at timing.  I don't look at customer class. I don't – that analysis is all being done by sales.  So I look at the revenue that the plan in its totality will cover or will generate, and I look at will that cover increased costs, that's what I look at.

**Pgs. 36-37**.

**Advice That Management Not Impose APIs was Ignored**

107. At his deposition in the Consumer Action, Kravets claims that he objected to imposing APIs with increased frequency, but his objections fell on deaf ears.

> Q. … in any of these meetings that you had with the executive committee, did you ever voice any objection to imposing automated price increases with increased frequency? A. Yes.
>
> Q. What objections did you voice?

A. I clearly demonstrated the or [sic] correlation between automated price increases and lost business, and suggested that we do not automatically increase customer prices.

Q. Because it actually caused Stericycle to lose more business than it was gaining through these price increases?

A. That reason amongst many others.

Q. What are some of the others?

A. It was causing significant amount of administrative burden and costs to address these issues with the end result being a customer loss.  It was hurting our customer loyalty results, and probably a handful of others that I can't think of offhand but given more time possibly.

\* \* \*

Q. Did you ever tell the executive committee that you didn't think it was fair to those customers?

A. I told the executive committee that I didn't support the strategy.

Q. What did the executive committee respond when you voiced your concerns about the automated price increase practice?

A. It was not a subject really worth discussing in the future.

\* \* \*

Q. Because they didn't change the behavior in response to the information that you provided the, did they? A. Correct.

Q. … did anyone on the executive committee actually tell you that this is not worth bringing up again in the future, we don't need to discuss again whether the impacts of automated price increases make them worthwhile or not? A. Yes.

Q. Who told you that?

A. Frank Ten Brink, Brent Arnold, Rich Kogler and I was also warned by Bob

Tangredi.

**Pgs. 158-161.**

108.     Kravets continued to describe each instance in which an executive informed

him not to bring up the topic of APIs.  When Kravets presented a correlation between price

increases, case volume, retention cases, and lost business to the executive team, he was shut

down.  Both defendant ten Brink and defendant Kogler specifically stated "we are not going to

talk about that."  **Pg. 162**.  Kravets further explained that there were other instances in which

he received a similar message, "[o]ccasionally directly and a lot of times through either Brent

[Arnold] or Bob Tangredi."  **Pg. 163**.  Tangredi's warnings came at the direction of defendants

Kogler, Alutto, ten

Brink or Miller when Kravets raised concerns about the "mean stream impact on customers," i.e.,

"the negative effects on the business," which made it more difficult for Kravets to meet his revenue

targets.  **Pgs. 165-66**.

109.     According to Kravets, others shared his viewpoint.

Q. … What about people at your management level or higher, your peers in upper

management a, can you tell me some of the people who you understood shared your

viewpoint about APIs?

A. I would say anyone at the director level or above who had knowledge of the practice.

Q. But obviously that doesn't extend all the way up to the executive team because,

as you said, they didn't share your viewpoints about automated price increases,

right?

A. Correct.

**Pg. 167.**

00540145

110. On September 18, 2016, Stericycle finally revealed that 60-70% of its SQ clients were exerting pricing pressure on Stericycle and forcing "discounts" on their contracts and that the Company was "enduring significant pricing pressure across its small medical waste customer base."  Defendants knew of the implementation of APIs.

## STERICYCLE'S STATEMENTS ABOUT ITS FINANCIAL PERFORMANCE AND CLIENT LOYALTY WERE IMPROPER

111. As explained below, for years, Stericycle publicly touted positive financial results, ignored the allegations in the lawsuits filed against it, and overstated its "high customer retention" of "14 to 40 years" "through excellent customer service."  None of this was correct.  In reality, Stericycle's financial results were propped up as a result of the Company's imposition of APIs; the lawsuits presented a substantial risk to the Company and have cost the Company hundreds of millions of dollars and a blow to its reputation; and the Company's APIs and inability to effectively deal with customer complaints once the APIs became public knowledge was harming its customer retention rates.

**Fourth Quarter 2012 and Year-End 2012**

112. On February 6, 2013, Stericycle released its financial results for the fourth quarter and full year of 2012, citing increased revenues over the same quarter in 2012 and increased growth. In particular, defendant ten Brink stated:

> Revenues were $503.6 million, up 12.8% from $446.6 million in Q4 of '12.  And internal growth, excluding returns and recall revenues, was up 8.4%.  Domestic revenues were $355.6 million, of which $332.7 million was domestic regulated waste and compliance services, and $22.8 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenue, was up 10%, consisting of SQ up 11% and LQ up 9%.  International revenues were $148.1 million, and internal growth, adjusted for unfavorable exchange impact of $2.3 million, was up 5%.  Acquisitions contributed $31.1 million to the growth in the quarter.

> The gross profit was $227 million, or 45.1% of revenues.  SG&A expense, including amortization, was $95.6 million, or 19% of revenues.  Net interest

expense was $13 million.  Net income attributable to Stericycle was $70.1 million, or $0.80 per share on an as reported bases, and $0.88 adjusted for acquisitions and other non-recurring expenses.

113.   Defendant Kogler added, that "[t]he strong internal growth rates we experienced in this quarter resulted from more and more customers adopting our multiple services."  He continued.  StrongPak is one of our regulated waste service offerings which helps retailers manage hazardous and pharmaceutical waste in a compliant manner. … "[w]e are excited about future growth, because our customers continue to adopt additional services such as StongPak.  These additional services can more than double or triple existing customer revenues."  Defendant Alutto added that, "the main growth drivers continue.  SQ being SteriSafe.  Clinical services on the international front.  And the sharps management service on the LQ side of the business."

114. The Company reported its full year 2012 results as follows:

> Revenues for the full year 2012 were $1.91 billion, up 14.1% from $1.68 billion in 2011.  Acquisitions contributed approximately $140.3 million to the current year's growth in revenues.  Revenues increased 15.4% compared to the prior year when adjusted for unfavorable foreign exchange impacts of $21.8 million.  Gross profit was $857.3 million, up 12.7% from $760.7 million in 2011.  Gross profit as a percent of revenue was 44.8% compared with 45.4% in 2011.  Earnings per diluted share increased 14.6% to $3.08 in 2012 from $2.69 in 2011.  Non-GAAP earnings per diluted share, when adjusted for various items, increased 15.4% to $3.30 from $2.86.

115.   On February 28, 2013, the Company filed its Form 10-K for the year ended December 31, 2012, which was signed by defendants Alutto, ten Brink, Miller, Schuler, Dammeyer, Hall, Lord, Patience, Zafirovski, Brown, and Spaeth.  The 2013 Form 10-K explained that Stericycle achieves higher gross margins with its SQ customers relative to its LQ customers because SQ customers "understand the potential risks of failing to comply with applicable regulations, [and] they appreciate the value of the services that we provide."  Stericycle noted that its "internal growth for domestic small account customers increased by $71.4 million, approximately 10%, driven by an increase of Steri-Safe revenues."  Stericycle further stated that "customers for our Steri-Safe service pay a predetermined subscription fee in advance for regulated waste collection and processing

services" and that "[o]ur Steri-Safe revenues are recognized evenly over the contractual service period."  Stericycle asserted that one of its competitive strengths was its "Diverse Customer Base and Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes."  Moreover, Stericycle claimed that it has "been able to maintain high customer retention through excellent customer service" and "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful live of 29.5 years."

116.    The statements made above were improper because: (i) Stericycle was engaged in a scheme to unilaterally and fraudulently increase the rates it charged its SQ customers without relation to the Company's actual costs incurred and without prior notice to its customers; (ii) the Individual Defendants were aware that the Company was improperly imposing APIs in violation of customer contracts; (iii) the Company's reported financial results were due—at least in part— to this undisclosed misconduct rather than for the reasons given by the Company to investors, i.e., "more and more customers adopting our multiple services," "Steri-Safe" was "the main the growth driver" for "SQ," and "Steri-Safe revenues" were driving growth for "domestic small account customers"; (iv) Stericycle's fraudulent rate increases caused a large number of Stericycle customers to leave the Company or demand their rates be lowered; (v) Stericycle's misconduct jeopardized the useful lives of its customer relationships, which it misleadingly claimed to be "14 to 40 years"; and (vi) the difference in margins between SQ and LQ customers resulted from the Company's fraudulent rate increases on SQ customers, and were not because SQ customers understood "the potential risks of failing to comply with applicable regulations."  **First Quarter 2013**

117.    On April 24, 2013, the Company released its financial results for the first quarter of 2013, noting increased revenues over the same quarter in 2012 and increased domestic internal growth.  In particular, defendant ten Brink reported:

00540145

Revenues were $513.8 million, up 11.7% from $460.1 million in Q1 of '12.  And internal growth, excluding returns and recall revenues, was up 8.1%.  Domestic revenues were at $363.6 million, of which $341.1 million was domestic regulated waste and compliance services, and $22.5 million was recalls and returns.  Domestic internal growth, excluding recalls and returns revenues, was up over 9%, consisting SQ up 10% and LQ up 8%.

118.    Defendant ten Brink also commented on customer turn-over or "churn,"

describing it as a nonissue:

Really, we don't see a major difference in churn.  We have a very good revenue retention, about 95%.  And the rest of 5% leaves us some customers don't pay their bills.  Obviously, we stop service.  There's doctors, dentists, that close their shops and retire, some consolidate.  That a 2%, and then your normal revenue, maybe 1% or 2% is obviously it's a competitive market, and we lose some to competition.

119.    Defendant Kogler again stated that "[t]he strong internal growth rates we experienced in this quarter resulted from more customers adopting our multiple services …" and the Company was "excited about our future growth, because when customers adopt multiple services, this can more than double or triple customer revenues."

120.    When asked about the proportion of total growth between auxiliary services and pricing, Kogler responded: "I think as we have said before … price is usually around CPI plus or minus depending on the customer type and then the rest of it is organic growth."  Kogler added, "On the SQ side, organic growth is StrongPak and Steri-Safe."  Defendant Kogler's statements were improper because Stericycle's growth was not organic.  Stericycle was systematically increasing the rates it charged SQ customers by 18% at least annually, and in some cases every six to nine months, which was well in excess of the customer price index ("CPI") "plus or minus."

121.    On May 9, 2013, the Company filed its Form 10-Q for the quarter ended March 31, 2013.  The Company claimed that its "[o]rganic revenue growth for domestic small account customers increased by $18.3 million, or approximately 10%, driven by an increase in Steri-Safe revenues and regulated waste management for retailers."  The Company also (i) reiterated that its "customer relationships have useful lives from 14 to 40 years based upon the type of customer, with

a weighted average remaining useful life of 26.1 years," and (ii) asserted that it "operated in accordance with the terms of our customer contracts"

122.    Accompanying the Form 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Alutto and ten Brink attesting to its accuracy and the adequacy of internal controls over financial reporting.

123.    The statements set forth in ¶¶128-133 were improper for the reasons stated in ¶127 above.  Further, ten Brink's description of customer churn as a nonissue was improper because it failed to disclose the true percentage of churn and that customers were leaving

Stericycle or refusing to pay their bills as a result of the Company's fraudulent billing practices.  Further, the statement that Stericycle "operated in accordance with the terms of our customer contracts" was improper because defendants knew or recklessly disregarded that they were violating their customer contracts.

**Second Quarter 2013**

135. Stericycle released its financial results for the second quarter 2014 on July 24, 2013, again noting increases in revenue and growth.  On the conference call, defendant ten Brink reported:

Revenues were $526.5 million, up 12.3% from $468.9 million in the second quarter of 2012.  And internal growth, excluding returns and recall revenues, was up 7.5%.  Domestic revenues were $370.2 million, of which $346.5 million was domestic regulated waste and compliance services, and $23.7 million was recalls and returns.

Domestic internal growth excluding recalls and returns revenues was up 7%, consisting of SQ up 8% and LQ up 6%.

International revenues were $156.3 million and internal growth adjusted for unfavorable exchange impact of $4.1 million was up approximately 9%.

Acquisitions attributed to $34.1 million to the growth in the quarter.

The gross profit was $237.9 million or 45.2% of revenues and SG&A expense including amortization was $100.6 million or 19.1% of revenues.

Net interest expense was $12.9 million and net income attributable to Stericycle was $78 million or $0.89 per share on an as-reported basis and $0.93 adjusted for acquisition and other nonrecurring expenses.

136.   Defendant Kogler added that "[t]he strong domestic internal growth rates we experienced this quarter resulted from more customers implementing our multiple services…"

137.   During the call, an analyst at Wunderlich Securities asked defendant Alutto for clarification about "the nature of the activity in Steri-Safe."

**Michael Hoffman** – *Wunderlich Securities – Analyst*

Okay, and then can you talk a little bit about sort of the nature of the activity in Steri-Safe? I remember, Charlie, when we met in New Orleans you talked about what I call up-selling, going from low tier pricing to mid-tier to high tier.  Can you frame the character or characterize that in the second quarter and sort of the trend as it goes through the year?  That and StrongPak.

**Charlie Alutto** – *Stericycle, Inc.- President and CEO*

I don't think there's – I'm sorry, Michael, what was the follow-up on that?

**Michael Hoffman** – *Wunderlich Securities – Analyst*

Well, and then StrongPak, a similar conversation about how do you feel about where that rate of growth is.  Is it still trending up or has it hit a level and it's holding?

**Charlie Alutto** – *Stericycle, Inc.- President and CEO*

I think Steri-Safe continues.  It's a long opportunity for us.  There hasn't been any material change in the percentage of growth attributed to Steri-Safe quarter to quarter.

138.   The current pricing environment in the US was another point of discussion on this call.  Defendant ten Brink conveyed that "[t]here's really no change in the market."  Defendant Kogler confirmed: "This business has always been competitive as long as I've been in it, and I've been in it for over a decade.  So it really doesn't change and, as I said, waste management continues to compete vigorously out there."

139.   On August 8, 2013, the Company filed its Form 10-Q for the quarter ended June 30, 2013, again claiming that its "customer relationships have useful lives from 14 to 40 years based upon the type of customer, with the weighted average remaining useful life of 26.1 years."

140.   Accompanying the Form 10-Q were certifications pursuant to SOX signed by defendants Alutto and ten Brink attesting to its adequacy and the adequacy of internal controls over financial reporting.

00540145

141.     These statements in ¶¶135-140 were improper for the reasons stated in ¶127 above.

Moreover, ten Brink's statement that there has been no material change in the percentage of growth

attributed to Steri-Safe quarter over quarter contradict defendant Alutto's previous statements that

Steri-Safe was a main growth driver for SQ customers.  Taken with his admission that there has been

no price increase in the market calls into question how Stericycle was able to drive revenue and

growth.

**Third Quarter 2013**

142.     On October 23, 2013, the Company released its financial results for the third quarter

of 2013, stating yet another quarterly increase in revenue and 8% internal growth on SQ.

On the conference call, defendant ten Brink reported:

Revenues were $534.6 million, up 11.3% from $480.5 million in Q3 of 2012, and
internal growth, excluding returns and recalled revenues, was up 6.5%.  Domestic revenues
were $378.1 million, of which $353 million was domestic regulated waste and compliance
services and $25.1 million was recalls and returns.  Domestic internal growth, excluding
recalls and returns revenues, was up 6.4%, consisting of SQ up 8% and LQ up 5%.
International revenues were $156.5 million, and internal growth adjusted for unfavorable
exchange impact of $5.3 million was up approximately 7%.  Acquisitions contributed $34.1
million to the growth of the quarter.

Gross profits was $241.4 million or 45.2% of revenues.  SG&A expense, including
amortization, was $102.3 million or 19.1% of revenues.  Net interest expense was $13.3
million, and net income attributable to Stericycle was $80.5 million or $0.92 per share on an
as-reported basis and $0.96 adjusted for acquisitions and other nonrecurring expenses.

143.     On the call, defendant ten Brink was asked how he would break up the Company's

8% growth in its domestic SQ business between an increase in SQ customers' prices and the volume

of SQ business.  Defendant ten Brink responded that the price increases on SQ customers were "a

little bit over the CPI on the price side, and then volume in the industry is obviously a little better on

the SQ than the LQ. So that's a couple percentage points, and then the rest is the additional services."

An analyst asked defendant ten Brink, "so if I work the math, CPI is running around 2%.  So on SQ

it splits pretty evenly between price and volume and ancillary services?"  To which defendant ten

Brink responded, "Yes, that's a good approximation."  Defendant ten Brink's statements were

improper because Stericycle was systematically increasing the rates it charged SQ customers by 18% at least annually, and in some cases every six to nine months, which was well in excess of the approximately 2% growth in the CPI.

144.    As a result of these comments, analysts reported that the amounts of Stericycle's price increases on its SQ customers were only slightly greater than the increases in the domestic consumer price index.  On January 13, 2014, Wunderlich reported that, on the issue of price growth at Stericycle for SQ customers, "Think about price at CPI to CPI plus a modest spread."  Wunderlich reiterated its Buy rating and raised its target price from $125 - $140.

145.    On November 7, 2013, the Company filed its Form 10-Q for the quarter ended September 30, 2013, in which it again claimed that its "customer relationships have useful lives from 14 to 40 years based upon the type of customer, with a weighted average remaining useful life of 25.9 years."

146.    Accompanying the Form 10-Q were certifications pursuant to SOX signed by defendants Alutto and ten Brink attesting to its accuracy and the adequacy of internal controls over financial reporting.

147.    The statements set forth in ¶¶142-146 above are improper for the reasons stated in ¶127 above.

**Fourth Quarter 2013 and Year-End 2013**

148.    On February 5, 2014, Stericycle released its financial results for the fourth quarter and full year 2013.  With regard to the full year profits were up 12% from 2012.  In the press release, the Company reported its full year 2013 results:

Revenues for the full year 2013 were $2.14 billion, up 12.0% from 1.91 billion in 2012.  Acquisitions contributed approximately $137.6 million to the current year's growth in revenues.  Revenues increased 13.0% compared to the prior year when adjusted for unfavorable foreign exchange impacts of $19.0 million.  Gross profit was $964.6 million, up 12.5% from $857.3 million in 2012.  Gross profit as a percent of revenues was 45.0% compared with 44.8% in 2012.  GAAP earnings per diluted share increased 15.7% to $3.56

from $3.08 in 2012.  Non-GAAP earnings per diluted share, when adjusted for various items identified in the second of the following tables, increased 12.4% to $3.75 from $3.34.

149.    On the conference call, defendant ten Brink reported that revenue increased

12.8% from the same quarter in 2012, and internal growth was again up with SQ accounting for

9%.  In particular, defendant ten Brink stated:


Revenues were $567.9 million, up 12.8% from $503.6 million in the fourth quarter of 2012, and internal growth, excluding returns and recall revenues, was up 7.1%.  Domestic revenues were $394.6 million, of which $368.2 million was domestic regulated waste and compliance services, and $26.4 million was recalls and returns.  Domestic internal growth, excluding recalls and return revenues, was up 7.8%, consisting of SQ up 9% and LQ up 7%.

International revenues were $173.3 million, and internal growth adjusted for unfavorable exchange impact of $5.4 million, was up approximately 6%.

Acquisitions contributed $32.4 million to the growth in the quarter.

Gross profit was $253.3 million, or 44.6% of revenues.  Adjusted for litigation settlements, gross profit was 45% of revenues.

SG&A expense, including amortization, was $109.9 million, 19.3% of revenues. Net interest expense was $15.3 million.  Net income attributable to Stericycle was $78.2 million, or $0.90 per share, on an as-reported basis and $0.99 adjusted for acquisition and other nonrecurring expenses.

150.    When asked on the call whether pricing would be better or worse in 2014, defendant

ten Brink responded "Yes, so if you look at the small quantity generated 8% to 10% kind of guidance

we give, roughly 40% to 50% of that growth comes from kind of price and volume in the market,

and the remainder is really the additional services.  So, this is compliance, this is Steri-Safe,

StrongPak, some ComSol, Communication Solutions feed." Further commenting on Stericycle's SQ

growth, defendant ten Brink added: "2013 and 2014, again, for us, very similar.  Our business is

very stable.  And so what I just mentioned as to the contribution from price and volume, we have no

different assumptions there."

151.    On February 28, 2014, the Company filed its Form 10-K for the year ended December

31, 2013, which was signed by defendants Alutto, ten Brink, Miller, Schuler, Dammeyer, Hall, Lord,

Patience, Zafirovski, Brown, and Spaeth.  The 2014 Form 10-K explained that Stericycle achieves higher gross margins with its SQ customers relative to its LQ customers because SQ customers "understand the potential risks of failing to comply with applicable regulations, [and] they appreciate the value of the services that we provide."  Stericycle further stated that "[c]ustomers for our Steri-Safe service pay a predetermined subscription fee in advance for regulated waste collection and processing services" and that "[o]ur Steri-Safe revenues are recognized evenly over the contractual service period."  Stericycle asserted that one of its competitive strengths was its "Diverse Customer Base and Revenue and Cost Stability" as the Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance or other operating costs because our regulated waste contracts typically allow us to adjust our prices to reflect these cost changes."  Moreover, Stericycle claimed that it has "been able to maintain high customer retention through excellent customer service" and "determined that our customer relationships have useful lives from 14 to 40 years based upon the type of customer, with weighted average remaining useful live of 24.6 years."

152.    Accompanying the Form 10-K were certifications pursuant to SOX signed by defendants Alutto and ten Brink attesting to its accuracy and the adequacy of internal controls over financial reporting.

153.    The statements set forth in ¶¶148-152 were improper for the reasons stated in ¶127 above.

**First Quarter 2014**

154.    On April 24, 2014, the Company released its financial results for the first quarter of 2014, announcing another 10.9% increase in revenue over the same quarter 2013.  On the conference call, defendant ten Brink reported the Company's earnings:

Revenues were $570 million, up 10.9% from $513.8 million in Q1 2013.  And internal growth excluding returns and recall revenues was up 6.3%.  Domestic revenues were $392.1 million, of which $369 million was domestic regulated waste and compliance services and $23.1 million was recalls and returns.  Domestic internal growth excluding recalls and return revenue was up 6.4%, consisting of SQ up 8% and LQ up 5%.  International

revenues were $177.9 million, and internal growth adjusted for unfavorable exchange impact of $8.1 million was up 6%.  Acquisitions contributed $32.9 million to the growth in the quarter.

Gross profit was $255.5 million or 44.8% of revenue. SG&A expense including amortization was $110.8 million or 19.4% of revenues.  Net interest expense was $14.9 million and net income attributable to Stericycle was $79.1 million or $0.91 per share on an as reported basis and 104 adjusted for acquisitions and other nonrecurring expenses.

155.    In breaking down Stericycle's SQ internal growth, defendant Alutto stated "SQ is about 8% to 10% internal organic growth. About 40% to 50% of that is price and volume.  The additional comes from additional services[.]"

156.    On May 8, 2014, the Company filed its Form 10-Q for the quarter ended March 31, 2014, which stated that its "customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 25.3 years."  The Company also claimed that its "[o]rganic revenue growth for domestic small account customers increased by $15.8 million, or approximately 8%, driven by higher revenues from our Steri-Safe, StrongPak, and other regulated compliance services."

157.    Accompanying the Form 10-Q were certifications pursuant to SOX signed by defendants Alutto and ten Brink attesting to the adequacy of internal controls over financial reporting.

158.    The statements set forth in ¶¶154-157 were improper for the reasons stated in ¶127 above.

**Second Quarter 2014**

159. On July 24, 2014, the Company released its financial results for the second quarter of 2014, revealing a 21.7% increase in revenue over Q2 2013 and an increase in domestic internal growth of 8.3% with SQ up 9%.  Defendant Ginnetti reported on the Company's earnings:

Revenues were $640.8 million, up 21.7% from $526.5 million in Q2 2013.  And internal growth, excluding returns and recall revenues, was up 7.2%.  Domestic revenues were $454.5 million, of which $429.8 million was domestic regulated waste and compliance services, and $24.7 million was recalls and returns.  Domestic internal growth, excluding recalls and returns revenues, was up 8.3%, consisting of SQ up 9% and LQ up 7%.

00540145

International revenues were $186.3 million, and internal growth adjusted for unfavorable exchange impact of $4.4 million was up 5%. Acquisitions contributed $81.7 million to the growth in the quarter.

Gross profit was $275.3 million, or 43% of revenues. SG&A expense, including amortization, was $121.7 million, or 19% of revenues. Net interest expense was $16.4 million. Net income attributable to Stericycle was $81.9 million, or $0.95 per share on an as-reported basis, and $1.03 adjusted for acquisitions and other nonrecurring expenses.

160.    On August 7, 2014, the Company filed its Form 10-Q for the quarter ended June 30, 2014, in which the Company claimed its "customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 24.2 years." The Company further stated that its "[o]rganic revenue growth for domestic small account customers increased by $35.2 million, or approximately 8%, driven by an increase in Steri-Safe revenues and regulated waste services for retailers."

161.    Accompanying the Form 10-Q were certifications pursuant to SOX signed by defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

162.    The statements set forth in ¶¶159-161 were improper for the reasons stated in ¶127 above.

**Third Quarter 2014**

163. On October 23, 2014, the Company released its financial results for the third quarter of 2014. On the conference call, defendant Ginnetti reported the Company's earnings:

Revenues were $667.9 million, up 24.9% from $534.6 million in Q3 2013, and internal growth, excluding returns and recall revenues, was up 10.3%. Domestic revenues were $470.7 million, of which $454 million was domestic regulated waste and compliance services, and $16.6 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 8.6%, consisting of SQ up 9% and LQ up 8%. International revenues were $197.2 million and internal growth adjusted for unfavorable exchange impact of $4.1 million was up 14.3%. Acquisitions contributed $93.8 million to the growth in the quarter. Gross profit was $279.5 million, or 41.9% of revenues. SG&A expense, including amortization, was $125.3 million, or 18.8% of revenues. Net interest expense was $16.6 million. Net income attributable to Stericycle was $82.8 million, or $0.96 per share on an as reported basis, and $1.08 adjusted for acquisitions related expenses and other adjusted terms.

164.    Based on these statements, Barrington Research reiterated their "Outperform" rating. Responding to defendant Ginnetti's statement that business "improve[d] by greater than 10 basis points," Great Lakes Review wrote that "3Q14 organic growth accelerated to in excess of 10%, the best figure in six years."

165.    On November 7, 2014, the Company filed its Form 10-Q for the quarter ended September 30, 2014, which stated with regard to its SQ sector that "[o]rganic revenue growth for domestic small account customers increased by $19.2 million, or approximately 9% driven by higher revenues from our Steri-Safe, regulated waste services for retailers, and other regulated compliance services."  Moreover, the Company claimed its "customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.7 years."

166.    Accompanying the Form 10-Q were certifications pursuant to SOX signed by defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

167.    The statements set forth in ¶¶163-166 were improper for the reasons stated in ¶127 above.

**Fourth Quarter 2014 and Year-End 2014**

168.    On February 5, 2015, Stericycle released its financial results for the fourth quarter and full year of 2014.  In the press release, the Company reported its full year 2014 results:

Revenues for the full year 2014 were $2.56 billion, up 19.3% from $2.14 billion in 2013.  Acquisitions contributed approximately $301.6 million to the current year's growth in revenues.  Revenues increased 20.8% compared with the prior period when adjusted for unfavorable foreign exchange impact of $33.6 million.  GAAP gross profit was $1.09 billion, up 13.5% from $964.6 million in 2013.  GAAP gross profit as a percent of revenues was 42.8% compared to 45.0% in 2013.  Non-GAAP gross profit, when adjusted for various items identified in the second of the following tables, was $1.10 billion, up 13.5% from $967.2 million in 2013.  Non-GAAP gross profit as a percent of revenues was 42.9% compared to 45.1% in 2013.  GAAP earnings per diluted share increased 6.3% to $3.79% compared to 45.1% in 2013.  GAAP earnings per diluted share increased 6.3% to $3.79 from $3.56 in 2013.  Non-GAAP earnings per diluted share, when adjusted for various items identified in the third of the following tables, increased 13.8% to $4.27 from $3.75.

169.   On the conference call, defendant Ginnetti reported Stericycle's 2014 fourth

quarter results.  In particular:

Revenues were $676.9 million, up 19.2 from $567.9 million in Q4 2013.   And internal
growth, excluding returns and recall revenues, was up 8%.

Domestic revenues were $479.7 million of which $462.7 million was domestic
regulated waste and compliance services and $17 million was recalls and returns.  Domestic
internal growth, excluding recalls and returns revenues was up 7.3% consisting of SQ up 8%
and LQ up 7%.

International revenues were $197.2 million.  And internal growth, adjusted for unfavorable
foreign-exchange impact of $17 million, was up 10%.

Acquisition contributed to $93.1 million to the growth in the quarter.  Gross profit
was $285.4 million or 42.2% of revenues.  SG&A expense, including amortization, was
$124.2 million or 18.3% of revenues.  Net interest expense was $18.1 million, net income
attributable to Stericycle was $82.5 million or $0.96 per share on an as reported basis and
$1.12 adjusted for acquisition related expenses and other adjusted items.

So versus the prior quarter, gross margins were up 30 basis points.

170.   Defendant Arnold touted improvements that Stericycle had made to foster continued

growth, claiming that "[w]e increased our regulated waste, operational infrastructure, enabling the

continued growth of our retail and SQ regulated waste business."

171.   On March 2, 2015, the Company filed its Form 10-K for the year ended December

2014, which was signed by defendants Alutto, Ginnetti, Miller, Schuler, Dammeyer,

Hall, Patience, Zafirovski, Chen, and Brown. In the 2014 10-K, Stericycle stated that

"[c]ustomers for our Steri-Safe service pay a predetermined subscription fee in advance for regulated

waste collection and processing services" and that "[o]ur Steri-Safe revenues are recognized evenly

over the contractual service period."  Stericycle asserted that one of its competitive strengths was its

"Strong Service Relationships with Customers" and touted its "Revenue and Cost Stability" as the

Company is "generally protected from the cost of regulatory changes or increases in fuel, insurance

or other operating costs because or regulated waste contracts typically allow us to adjust our prices

to reflect these cost changes."  In addition, Stericycle claimed that it targets SQ customers because

"[w]e believe that when small-quantity regulated waste customers understand the potential risks of

failing to comply with applicable regulations, they appreciate the value of the services that we provide." And, this was "the basis for the higher gross margins that we have achieved with our [SQ] customers relative to our [LG] customers." Stericycle reiterated that its "customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.8 years" and it had "been able to maintain high customer retention through the quality of our customer service."

172.    Accompanying the Form 10-K were certifications pursuant to SOX signed by defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

173.    The statements set forth in ¶¶168-172 were improper for the reasons stated in ¶127 above.

**First Quarter 2015**

174.    On April 23, 2015, the Company released its financial results for the first quarter of 2015. On the conference call, defendant Ginnetti reported the Company's earnings:

Revenues were $663.3 million, up 16.4% from $570 million in Q1 2014. Internal growth, excluding returns and recall revenues, was up 6.8%. Domestic revenues were $472.2 million, of which $452.3 million was domestic regulated waste and compliance services and $20 million was recalls and returns. Domestic internal growth, excluding recalls and returns revenues, was up 6.4%, consisting of SQ up 8% and LQ up 5%. International revenues were $191.1 million. And internal growth, adjusted for unfavorable foreign exchange impact of $23.1 million, was up 8%.

Acquisitions contributed $86.3 million to the growth in the quarter. Gross profit was $281.3 million, or 42.4% of revenues. SG&A expense, including amortization, was $128.3 million, or 19.3% of revenues. Net interest expense was $18.6 million. Net income attributable to Stericycle was $75.5 million, or $0.87 per share on an as reported basis, and $1.08 adjusted for acquisition-related expenses and other adjusted items.

175.    The Company missed its revenue guidance by $13.8 million, which Ginnetti dismissed by blaming "the extreme weather impact that we had and its impact on seasonality, as well as the lower energy surcharges that we got in Q1." Notwithstanding the miss, Ginnetti conveyed

they were "very pleased with the performance in the quarter" and that "there was really good growth in our core business."

176.    Despite the revenue miss, defendant Alutto claimed the Company was still experiencing positive internal growth:

I think when you look at the growth drivers for our SQ customer base in the US, there are several growth drivers that drive our organic internal growth.  SteriSafe is one of them, Communication Solutions, our hazardous waste, our Environmental Solutions business Brent [Arnold] talked about, the recently completed integration of the PSC [i.e., PSC Environmental Services, LLC another provider of environmental and regulated waste management solutions], really they all contribute.  We continue to improve the SteriSafe offering, which gives us an ability to increase value for our customers and an opportunity to also accelerate revenue growth and profitability.

I think if you look at the growth engines on the SQ side of the business, SteriSafe still provides a majority of the growth on the SQ business, and then Com Sol, Communication Solutions and Environmental Solutions adds some additional growth there.

177.    Analysts continued to respond positively to Stericycle.  For example, Jeffries stated, "the core business remain[s] healthy and margins and addressable opportunities continue to expand."

178.    On May 7, 2015, the Company filed its Form 10-Q for the quarter ended March 31, 2015, describing its financial results for the first quarter of 2015, and claiming that its "customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.6 years."

179.    Accompanying the Form 10-Q were certifications pursuant to SOX signed by defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

180.    The statements set forth in ¶¶174-179 were improper for the reasons stated in ¶127 above.

181.    On June 1, 2015, speaking at the Stifel Investors Summit, defendant ten Brink stated that Stericycle enjoyed 8% to 10% internal growth from SQ customers, with the price component of

such growth being slightly higher than CPI.  Specifically, ten Brink claimed that, "I think that we have said in the past on our small customers, we get a little bit better on CPI on price."

182.    At the Stifel Investors Summit, in response to a question about competition and retention, defendant Arnold stated, "our additional services has not just been to grow the business, but to better serve the customer.  And as you know, as you become more intertwined, more valuable to that customer, the retention rate also increases."

183.    On July 16, 2015, during a conference call discussing the acquisition of Shred-it International, Inc., Alutto compared the Company's business to Shred-it's and said both "have a similar and exciting growth pattern" and "[r]ecurring revenue and multi-year contracts provide both business with a very predictable and profit profile.  SQ customers provide a stable and profitable customer base."  Moreover, defendant Arnold described Stericycle's customers as "our large loyal base of customers."

184.    The statements set forth in ¶¶181-183 were improper because Stericycle was systematically increasing the rates charged to SQ customers well in excess of the growth in CPI. Further, defendant ten Brink knew or recklessly disregarded the Company's fraudulent billing practices were undermining its relationships with its customers.

**Second Quarter 2015**

185. On July 23, 2015, the Company released its financial results for the second quarter of 2015.  On the conference call, defendant Ginnetti reported the Company's earnings:

Revenues were $715.7 million, up 11.7% from $640.8 million in Q2 2014.  Internal growth, excluding returns and recall revenues, was up 7.7%.  Domestic revenues were $518.2 million, of which $489.9 million was domestic regulated waste and client services, and $28.3 million was recalls and returns.  Domestic internal growth, excluding recalls and returns revenues, was up 6.6%, consisting of SQ up 8% and LQ up 5%.

International revenues were $197.5 million and internal growth adjusted for unfavorable foreign exchange impact of $27.3 million was up 10%.  Acquisitions contributed $58.9 million to growth in the quarter.  Gross profit was $305.3 million, or 42.7% of revenues. SG&A expense, including amortization, was $135.7 million, or 19% of revenues. Net interest expense was $16.4 million.  Net income attributable to Stericycle was $60.5

million or $0.70 per share on an as reported basis and $1.14 adjusted for acquisition-related expenses and other adjusted items.

So we are very pleased with our third straight quarter-over-quarter increase in gross margin. Our increase over Q1 was 25 basis points. So, if you start with a Q1 gross margin of 42.4%, the returns on the recall business rebounded from the weather and seasonality, and that increased our margin by about 55 basis points.

186.     Defendant Alutto stated, "SQ growth, as we have stated in our guidance, is 8% to 10% growth. …Again, about 40% to 50% of that organic growth is related to price and volume, and then 50% to 60% of that, so the remainder of that growth, is in the additional services, whether that's Steri-Safe hazardous-waste disposal, Communications Solutions, they all contribute to the SQ growth."

187.     On August 9, 2015, the Company filed its Form 10-Q for the quarter ended June 30, 2015, which stated that "[o]rganic revenue growth for domestic small account customers increased by $18.4 million, or approximately 8%, driven by higher revenues from our Steri-Safe and regulated waste services for retailers." The Company also stated that its "customer relationships have useful lives from 10 to 40 years based upon the type of customer, which a weighted average remaining useful life of 23.2 years."

188.     Accompanying the Form 10-Q were certifications pursuant to SOX signed by Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

189.     The statements set forth in ¶¶185-187 were improper for the reasons stated in ¶127 above.

## THE TRUTH SLOWLY EMERGES

190.     Stericycle revealed a series of disappointing financial results while obscuring the reasons for the adjusted growth rates and lowered guidance.

### Third Quarter 2015

191.     During the Company's October 22, 2015 earnings call, defendant Alutto noted Stericycle's fiduciaries were "disappointed with the results and the third quarter." As a result, they

"adjusted the domestic LQ and SQ growth rates for 2015 and 2016," and issued 2016 guidance below analyst expectations, revealing some negative financial impact of SQ customers leaving or renegotiating their contracts at lower prices. Rather than admitting what was truly affecting revenue and growth rates, Alutto attributed it to "headwinds related to fuel surcharges and those hazardous waste volumes." According to defendant Alutto, the decline in industrial waste volumes was due "to the drop in energy and commodity prices."

192.    The information shared in the earning call caused the price of Stericycle's common stock to drop from $149.04 per share on October 22, 2015 to $120.31 on October 23, 2015 – a 19% decline and over $2 .4 billion market capitalization loss – and its depository shares to fall from $106.34 to $92.56 per share – a 13% decline and over $106 million aggregate loss. However, investors were reassured by management's continued false statements that Stericycle's core business was still performing well. Specifically, defendant Alutto noted the "strong growth that we are experiencing in the overall business." Material misrepresentations and omissions continued to artificially inflate the prices of Stericycle securities.

193.    On the call, defendant Arnold attempted to reassure investors that the Company was still experiencing positive growth, stating:

In the quarter we experienced a solid growth in selling additional services to our existing customer base. This growth came from retail hazardous waste, sharps equipment, pharmaceutical waste, and communication solutions. For example, we are seeing increased adoption of our pharmaceutical waste service by physician practices. By utilizing our existing customer relationships along with our environmental solutions infrastructure, we are able to deliver a simple and cost-effective service that keeps our customers compliant and helps protect the environment.

194.    On November 9, 2015, the Company filed its Form 10-Q for the quarter ended September 30, 2015, stating that "[o]rganic revenue growth for domestic small account customers increased by $18.3 million, or approximately 7%, driven by higher revenues from our Steri-Safe and regulated waste services for retailers," and identifying its "customer relationships['] … useful lives

from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 23.2 years."

195.    Accompanying the Form 10-Q were certifications pursuant to SOX signed by defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

196.    These statements were improper because the revenue, growth, and margin results reported resulted, in part, from revenues Stericycle improperly generated by violating their SQ customer contracts and deceptively increasing the rates charged to their customers.  Defendants also knew the Company's earnings and growth were not meeting expectations due to negative customer reaction to Stericycle's fraudulent billing practices and the resulting customer attrition and that this scheme was undermining the useful life of Stericycle's customer relationships.

**Fourth Quarter 2015 and Year-End 2015**

197. On February 4, 2016, Stericycle released its financial results for the fourth quarter and full year of 2015.  On the call, defendant Ginnetti reported:

Revenues were $888.3 million, up 31.2% from $676.9 million in Q4 2014, and internal growth, excluding returns and recall revenues, was up 5.2%.  Domestic revenues were $651.1 million, of which $626.8 million was domestic regulated waste and compliance services and $24.3 million was recalls and returns.

Fourth-quarter domestic internal growth, excluding returns and recalls revenues, was up 4% consisting of SQ up 6% and LQ up 2%.  As anticipated, growth rates were impacted by lower fuel surcharges and lower hazardous waste volumes from our industrial customers.

International revenues were $237.2 million, and internal growth adjusted for unfavorable foreign exchange impact of $26.9 million was up 8.1%.  This growth rate was also impacted by lower hazardous waste volume.

Acquisitions contributed $200 million to growth in the quarter.  Gross profit was $380.4 million, or 42.8% of revenues.  SG&A expense, including amortization, was $203.6 million, or 22.9% of revenues.  Net interest expense was $24.9 million.  Net income attributable to Stericycle was $78.9 million, or $0.80 per share on an as reported basis, and $1.11 when adjusted for acquisition related expenses and other adjustments.

198.   Defendant Alutto also stated that "[o]verall, our business performed very well in the quarter and remains on track despite foreign-exchange headwinds and lower hazardous waste volume from our industrial customers."  Following up on this comment defendant Alutto explained that different parts of the business performed higher than the Company's current growth rate, "[s]o it varies by business line, but the business itself … is growing at or about our Company average."

199.   On March 15, 2016, the Company filed its Form 10-K for the year ended December 31, 2015, which was signed by defendants Alutto, Ginnetti, Miller, Schuler, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski.  In the 2015 Form 10-K, Stericycle tried to reassure stockholders as it maintained it developed a comprehensive service "at low, flat monthly fees" and that it had "developed a strong and loyal customer base, with a revenue retention rate exceeding 90%," Stericycle claimed that one of its strengths was its "Strong Service Relationships with Customers" and that it had "determined that our customer relationships have useful lives from 10 to 40 years based upon the type of customer, with a weighted average remaining useful life of 19.2 years."

200.   Accompanying the Form 10-K were certifications pursuant to SOX signed by defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

201.  The statements set forth in ¶¶197-200 were improper because the Company's financial results were artificially inflated as result of Stericycle's deceptively increasing the rates it charged its customers.  Further, defendants knew, or were reckless in not knowing, that this scheme did not result in "low, flat monthly fees" for customers and was in fact eroding customer loyalty and the useful life of Stericycle's current customer relationships.

**First Quarter 2016**

202.   On April 28, 2016, the Company released its financial results for the first quarter

2016, which fell below the Company's guidance and analyst expectations.   Stericycle reported $1.11 in adjusted earnings per share, below the Company's guidance of $1.17 and the analyst consensus estimate of $1.14.   Moreover, Stericycle lowered its 2016 adjusted earnings per share guidance to $4.90 - $5.05 from $5.26 - $5.33.

203.     Notwithstanding, Company executives attempted to attribute poor performance to a general "slowdown in the hazardous waste" business, and reassured investors that Stericycle "continue[d] to experience strong growth."   Defendant Arnold stated that "[i]n our retail and healthcare hazardous waste compliance programs, we continue to experience strong growth.  The growth is fueled by increased enforcement of existing regulations and by Stericycle strong customer relationships in both retail and the healthcare industry."   Further, taking into account that services in addition to medical waste contribute to growth, "[w]e actually did well on our growth rates, although the SQ growth rates were 6 and 4.  If you adjust those growth rates for the impact of the fuel surcharge and the lower haz-waste volume, it would have been more like a 9 and a 6 in the quarter."

204.     Defendant Alutto stated that although the Company "did see a lower hazardouswaste volume," "[w]e had really strong growth there."   And, defendant Ginnetti claimed that "healthcare, hazardous, and retail continue to have great growth."   In reality, the Company's poor performance was due, at least in part, to negative customer reaction to the Company's illegal billing practices and the resulting customer attribution.

205.     During the earnings call, defendant Alutto admitted to problems with "pricing pressure" where hospitals (typically LQ customers) were acquiring individual doctors' offices

(SQ customers):

Remember the decision-maker changes a little bit when the hospital acquires a doctor's practice.  Where we have normally dealt with an officer administrator or officer manager, we are now dealing with more personnel from the hospital.  So we believe we will see some pricing pressure on hospital-affiliated SQ accounts as these contracts come up for renewal.

206.    The implication of this statement was that when LQ customers acquired SQ customers, they could renegotiate the SQ contracts.  The ability of the LQ customer to do so reflects the excessive rates of the SQ contracts.

207.    After the April 28, 2016 disclosure, the Company's stock price fell from $121.74 per share to $94.56, a decline of 21.5% representing a total market capitalization loss of $2.2 billion. The trading of Stericycle's depository shares fell from $91.76 per share to $77.66, a decline of 15.4% and an aggregate loss of over $108 million.  Rather than disclosing the true extent of the Company's poor performance at this time, the Company still misled the market to believe that its revenues were based on legitimate billing practices.  These material misrepresentations and omissions continued to buffer the price of Stericycle's common stock and depository shares.

208.    On May 9, 2016, the Company filed its Form 10-Q for the quarter ended March 31, 2016, which claimed that "[o]rganic revenue growth for domestic small account customers increased by $17.0 million, or approximately 6%, driven by an increase in Steri-Safe revenues and regulated waste services for retailers."  Accompanying the Form 10-Q were certifications pursuant to SOX signed by defendants Alutto and Ginnetti attesting to its accuracy and the adequacy of internal controls over financial reporting.

**Second Quarter 2016**

209.    On July 28, 2016, Stericycle released its financial results for the second quarter of 2016.  During the conference call discussing the results, Stericycle announced that growth in its core and noncore business decelerated and lowered its 2016 earnings per share guidance to $4.68 - $4.75 per share from $4.90 - $5.05 per share.  The Company blamed its results and cut in guidance partially on "increased pricing pressure on our SQ customer base" as a result of "consolidation of physician practices by hospitals and the overall healthcare cost pressures resulting from managed-care" and an "an increasing amount of discounting that we need to make to renew those [SQ] agreements."  The Company stated that the same issues would likely result in 2017 growth rates below Stericycle's

00540145

historical average, essentially conceding that limitations on rates it can charge these customers materially affected its results and will continue to do so.

210.    When asked why Stericycle was just seeing the issue of consolidation when it "has been happening in the space for a long time now," defendant Arnold responded:

[N]ow that these doctors practices that have been acquired by hospitals are starting to get integrated into their networks, we are starting to see continued pressures as those contracts come up at the put those out for large RFP – we're starting to see increased pricing pressure associated with that, that's now having a material impact on our business. Secondly, we're seeing to a lesser extent we're also seeing the same trends now in our SQ business as we go to renew those contracts we're also seeing pricing pressure and the need to do discounts to get new renewals.

211.    Defendant Alutto acknowledged that the issues with organic growth rates were due, in part, to Stericycle's "inability to get the price that [Stericycle] assumed it was going to be able to get from these renewals."  Defendant Alutto also revealed that "like 18% to 20%" of SQ customers were requesting discounts tied to contract renewals in connection with consolidation.

212.    With regard to the timing of the effects of the pricing pressure—as "the kind of issue that would develop over time," Alutto responded:

Yes, I think if you look at this certainly it has been something that we've looked at for many years.  We actually, within the company, we call it blended account, hospital affiliated account.  Certainly, it's been a trend.  We've seen over the years some pricing pressure not really material to the overall numbers.  We did see it increasing in Q1 and that's why we kind of spoke about it on the last call.  We saw that trend continue and more contracts get renegotiated in Q2…"

213.    Defendant Arnold also disclosed pricing pressure from SQ customers not affiliated with larger customers:

The other [aspect] is just with the local and regional competition and just the unaffiliated SQ looking to save more money as their reimbursements going down.  We are noticing an increasing amount of discounting that we need to make to renew those agreements.  Again, it's not like the business is declining.  This is just cutting into our overall growth.

214.    These disclosures caused the Company's stock price to fall from $105.93 per share to $90.27, representing a market capitalization loss of over $1.3 billion.  Further, the trading price of

Stericycle's depository shares fell from $84.72 per share to $73.18, for an aggregate loss of over $88 million.

### The September 18 and 19, 2016 Disclosures

215.    On September 19, 2016, before the market opened, Stericycle disclosed through analysts that, apart from the pricing pressure resulting from hospitals acquire SQ customers, the 60-70% of U.S. SQ clients that are independent physician practices were also exerting pricing pressure on the Company, and achieving 10-15% price discounts on their Stericycle contracts at the time of contract renewal.

216.    Several analysts issued reports discussing this development and reducing their estimates on Stericycle based on this news.  For example, in a report dated Sunday, September

18, 2016, RBC reported that it was reducing Stericycle estimates in order to "incorporate recent

company commentary, which has emphasized several negatives from Q2."  Specifically, RBC reported:

**Pricing pressure in US SQ med waste is expanding.** Recent commentary from the company suggests that US SQ med waste pricing pressure is broader than previously believed, which bodes poorly for margins and profit growth.  The company has discussed the ~20% of its US SQ mix that is hospital-owned physician practices, where it has seen 10-30% pricing pressure upon renewals. However, it has also recently acknowledged that the 60-70% of US SQ clients that are independent physician practices are also seeing 10-15% price discounts at renewal due to rising local and regional competition. [Stericycle] guided for this to be a $0.10-$0.13 EPS headwind in H2/16, and it could be double that for 2017.

\*   \*   \*

**US SQ pricing pressure is the latest negative development**.... [A]rguably the most troubling development in recent quarters is the company's acknowledgement that it is seeing mounting pricing pressure in its key US small customer (SQ) medical waste and compliance business. Approximately 20% of this customer base is made up of physician practices that have been acquired by hospitals, which it has seen begin to demand significant pricing concessions (10-30%) upon contract renewals, as those hospital owners press for terms closer to what the hospitals themselves pay Stericycle. In addition, the company has recently stated that rising competitive pressures from local and regional competitors has led to 10-15% price concessions at renewal with a portion of the base of independent physician practices (60-70% of the US SQ customer base). Given that contracts typically last several years, this pressure seems likely to continue in future years as the base of SQ business comes up for renewal. And, with US SQ medical waste having margins more than double the level

of any of the company's other businesses, it would be a significant negative for margins and profit growth if this pricing pressure continued (or accelerated).

217.    RBC reiterated its Underperform rating and drastically lowered its price target from $89.00 to $77.00, stating "investors should continue to avoid the stock."

218.    An Oppenheimer analyst report issued Monday, September 19, 2016, also addressed the SQ customer pricing pressure: "[Stericycle] indicated ~20% of its small customers are now affiliated with large customers, who are progressively pushing for ~30% pricing concession as contracts mature.   Another 60% of (unaffiliated) small customers are seeking ~15% pricing concessions (enhanced competitive marketing).   We interpret a multi-year tail to the pricing dynamic.

219.    Oppenheimer also found that "the most prominent discussion point [during investors' meetings with management] was Stericycle's announcement in its 2Q16 conference call that it was enduring significant pricing pressure across its small medical waste customer base."  Specifically,

[I]nvestors exhibited the greatest level of interest in newly announced (on the 2Q16 conference call) pricing challenges Stericycle is facing in its core medical waste business primarily relating to small quantity customers. Not only has pricing pressure stemmed from large quantity customers aggregating small quantity customers and pushed for concessions at renewal time, but an even larger portion of Stericycle's small quantity portfolio (unaffiliated with larger aggregators) have become more active in pursuing lower prices in what the company refers to as a now more competitively marketed environment.

While we can envision light at the end of the tunnel for each of Stericycle's current challenges, the pricing challenges in its core medical waste business appears to have investors most unsettled since Stericycle acknowledges visibility is suboptimal, and the pricing dynamic could persist as a headwind beyond 2017 as small customer medical waste contracts are typically 3-5 years in length. As it always has historically, Stericycle will provide out-year (2017 in this case) guidance on its 3Q16 conference call. Further understanding the adverse profitability magnitude and tail of the pricing challenges Stericycle is facing with its core small quantity medical waste customers, we're modifying our 2017 cash EPS estimate from $5.20 to $4.78 while maintaining our 2016 cash EPS estimate of $4.71.

220.    The report also discussed Oppenheimer's recent meeting in Europe with defendant Ginnetti in which he addressed "small customer medical waste pricing challenges."

221.     William Blair also issued a report on September 19, 2016, stating that "Street Estimates Likely Remain Too High" and describing the pricing pressure in the SQ customer segment as a "key hot button topic."   William Blair also stated that "the recent weakness in the core small-quantity healthcare business (related to emerging pricing pressure in the space due to industry consolidation among provider groups and hospitals) could present a near-term overhang on the stock."

222.     The disclosures in the various September 18 and 19, 2016 reports discussing the serious "pricing pressure" at Stericycle caused the Company's stock price to fall from $81.24 per share on Friday, September 16, 2016 to $78.00 on September 19, 2016, for a total market capitalization loss of over $275 million.   The trading price of Stericycle's depository shares fell from $66.11 per share on September 16, 2016 to $64.20 on September 19, 2016, for a total market capitalization loss of over $14 million.

223.     Most recently, on February 21, 2018, defendant Ginnetti revealed on the Company's Q4 2017 earnings call with analysts and investors that Stericycle expected a negative impact of $25 million related to a "revised long-term commercial strategy focused on strengthening" Stericycle's relationships with its SQ customers.   This strategy was necessary for Stericycle to "reduce or limit [its] annual price increase with specific customer segments in an effort to reduce [its] churn and long-term discounting."

224.     However, as noted by defendant Alutto, discounting continues.   In responding to a question about medical waste pricing, defendant Alutto noted that the Company "anticipate[s] the impact [of SQ discounting] to be about $130 million, which would imply that we still have in our guidance about $45 million in SQ discounting in 2018 and an addition $20 million in 2019."

225.     Further, the Company filed its Form 8-K with the SEC on the same day, which revealed that Stericycle had not yet resolved the issues associated with price increases:

EPS of $0.27, a decrease of 87.0%, due primarily to the impact of the previously announced small quantity customer class action settlement (the "Settlement") and certain non-recurring litigation matters of $2.38, a $0.79 non-cash goodwill impairment charge in Latin America, and $0.23 of Business Transformation related expenses, partially offset by favorable impact of $1.52 from U.S. tax reform.  Adjusted EPS of $4.34, a decrease of 4.2%.

226.    In response to the Company's disclosures, the price of Stericycle stock fell from $74.91 to $60.05, or 19%, reflecting a market capitalization loss of over $1.2 billion.

## THE FALSE AND MISLEADING 2015 PROXY

227.    On April 17, 2015, defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski caused Stericycle to file with the SEC its 2015 Proxy on Form DEF14A in connection with the 2015 Annual Meeting of Stockholders, held on May, 27, 2015.

228.    Plaintiff's allegations with respect to the misleading statements in the 2015 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

229.    The 2015 Proxy contained a stockholder proposal demanding the Board adopt a policy that called for the Chairman of the Board to be independent.  The proposal states:

Shareholders request that our Board of Directors adopt a policy that the Chairman of our Board of Directors shall be an independent director who is not a current or former employee of the company, and whose only nontrivial professional, familial or financial connection to the company or its CEO is the directorship. The policy should be implemented so as not to violate existing agreements and should allow for departure under extraordinary circumstances such as the unexpected resignation of the chair.

230.    In opposition to this proposal, the Company asserts:

**The Company's Statement in Opposition**

**The Board of Directors believes that this proposal is unnecessary and is not in the best interests of our stockholders.  Consequently, the Board recommends a vote "AGAINST" this proposal.**

\*   \*   \*

Seven of nine (and assuming Ms. Bleil's election to the Board, eight of ten) of our directors are independent, and the Board regularly reviews the Company's governance to ensure independent oversight of management. In addition to the requirement to empower a Lead Director when the Chairman of the Board is not independent, examples of independent oversight include the following:

• All members of the Audit, Compensation, and Nominating and Governance Committees of the Board are independent. As provided in their charters, these committees have oversight responsibilities over critical matters for the Company and play a robust role in the Company's governance, with direct access to management and authority to retain independent advisers. The oversight responsibilities of these committees include the quality and integrity of our financial statements, our compliance with legal and regulatory requirements, the performance and compensation of executive officers, the nomination of directors, and the evaluation of the effectiveness of the Board, its committees and its members.

• At each regularly scheduled meeting of the Board, the independent directors meet in executive session, presided over by the Lead Director, to review the performance of management and in particular the performance of our President and Chief Executive Officer and Executive Chairman of the Board.

Our strong performance further supports our belief that our current governance structure is effective. The following table compares the cumulative total shareholder return (*i.e.*, share price appreciation plus dividends) ("TSR") for the one-, three-, and five-year periods ending December 31, 2014 for Stericycle, the NASDAQ Composite, the S&P 500 Index, the Russell 3000 Index and the Dow Jones US Waste and Disposal Index.

|  | One-Year TSR (%) | Three-Year TSR (%) | Five-Year TSR (%) |
|---|---|---|---|
| Stericycle, Inc. | 12.8 | 68.2 | 137.6 |
| NASDAQ Composite | 13.4 | 81.8 | 108.7 |
| S&P 500 Index | 11.4 | 63.7 | 84.6 |
| Russell 3000 Index | 10.5 | 64.9 | 87.4 |
| Dow Jones US Waste and Disposal Index | 11.4 | 44.2 | 64.5 |

For the foregoing reasons, a policy that requires an independent Chairman is unnecessary and not in the best interests of our stockholders.

Accordingly, **the Board of Directors recommends a vote "AGAINST" this proposal.**

231.   The Board states the "oversight responsibilities of [its] committees include the quality and integrity of our financial statements, our compliance with legal and regulatory

requirements, the performance and compensation of executive officers, the nomination of directors, and the evaluation of the effectiveness of the Board, its committees and its members." Notwithstanding, as previously explained, the Board failed in its oversight responsibilities by filing statements with the SEC and making statements to the public investors that were improper and misleading.

232.    Moreover, the Company's recommendation is based in part on Stericycle's "strong [financial] performance."  However, the figures provided in the 2015 Proxy are misleading as Stericycle's financial statements are based on the Company's unlawfully imposing 18% APIs on its customers year after year.

233.    The 2015 Proxy also solicited stockholder votes to elect defendant Bleil and reelect defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski to the Board.  Defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski negligently issued materially misleading statements with respect to these solicited votes.

234.    In support of electing defendant Bleil and reelecting defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski, the 2015 Proxy claimed that the Audit Committee: (i) fulfills "oversight responsibilities relating to the integrity of our financial statements"; (ii) "reviews our risk management policies and practices and reports any significant issues to the Board"; and (iii) "recommended … that the Board approve the inclusion of the Company's audited financial statements in the Company's annual report on Form 10-K for the year ended December 31, 2015 for filing with the SEC."

235.    The statements of defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk

management practices.  The 2015 Proxy omitted any disclosures that: (i) the Company was engaged in an unlawful practice of increasing customer APIs in violation of contract terms; (ii) the legal action taken against the Company as a result of this unlawful practice was meritorious; (iii) as a result of the scheme, a significant portion of Stericycle's publicly reported revenues and earnings were unlawfully obtained; (iv) the Company lacked adequate disclosure controls and procedures; and (v) as a result, the unlawful activity continued unabated at Stericycle.  The

Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements.  The Company was reporting inflated earnings and revenues as a result of its unlawful implementation of APIs, and therefore, its financial statements were not appropriate to include in the Company's annual report.  Defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski were negligent in including these misleading statements in the 2015 Proxy.

236.    The 2015 Proxy harmed Stericycle by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the defendants' misleading statements in the 2015 Proxy, Stericycle's stockholders voted to elect defendant Bleil and reelect defendants Miller, Schuler, Alutto,

Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski.

## THE FALSE AND MISLEADING 2016 PROXY

237.    On April 15, 2016, defendants Miller, Schuler, Alutto, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski caused Stericycle to file with the SEC its 2016 Proxy on Form DEF14A in connection with the 2015 Annual Meeting of Stockholders, held on May, 25, 2016.

238.    Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff

specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

239.    The 2016 Proxy contained a stockholder proposal on independent Chairman of the Board. The proposal states:

**RESOLVED:** The stockholders of Stericycle, Inc. (the "Company"), ask the Board of Directors to adopt a policy that, whenever   possible, the board chairman should be a director who has not previously served as an executive officer of the Company and who is "independent" of management. For these purposes, a director shall not be considered "independent" if, during the last three years, he or she—

•      was affiliated with a company that was an advisor or consultant to the Company, or a significant customer or supplier of the Company;

•      was employed by or had a personal service contract(s) with the Company or its senior management;

•      was affiliated with a company or non-profit entity that received the greater of $2 million or 2% of its gross annual revenues from the Company;

•      had a business relationship with the Company that the Company had to disclose under the Securities and Exchange Commission regulations;

•      has been employed by a public company at which an executive officer of the Company serves as a director;

•      had a relationship of the sort described above with any affiliate of the Company; and,
•      was a spouse, parent, child, sibling or in-law of any person described above.
•
The policy should be implemented without violating any contractual obligation and should specify how to select an independent chairman if a current chairman ceases to be independent between annual shareholder meetings. Compliance with the policy may be excused if no independent director is available and willing to be chairman.

240.    In opposition to this proposal, the Company asserts:

**The Board of Directors believes that this proposal is unnecessary and is not in the best interests of our stockholders.  Consequently, the Board recommends a vote "AGAINST" this proposal.**

\*   \*   \*

Eight of ten of our directors are independent, and the Board regularly reviews the Company's governance to ensure independent oversight of management. In addition to the requirement to empower a Lead Director when the Chairman of the Board is not independent, examples of independent oversight include the following:

•      All members of the Audit, Compensation, and Nominating and Governance Committees of the Board are independent. As provided in their charters, these committees have   oversight responsibilities over critical matters for the Company and play a robust role

in the Company's governance, with direct access to management and authority to retain independent advisers. The oversight responsibilities of these committees include the quality and integrity of our financial statements, our compliance with legal and regulatory requirements, the performance and compensation of executive officers, the nomination of directors, and the evaluation of the effectiveness of the Board, its committees and its members.

• At each regularly scheduled meeting of the Board, the independent directors meet in executive session, presided over by the Lead Director, to review the performance of management and in particular the performance of our President and Chief Executive Officer and our Chairman of the Board.

In addition, our directors annually review the performance of the Board of Directors and its committees and the performance of their fellow directors to ensure that the Board and Board committees are functioning effectively.

We believe the corporate governance measures noted above demonstrate that our Board is structured effectively to exercise independent oversight. In addition, the Company's stockholders have considered, and declined to provide majority support to, a similar independent board chairman proposal at our 2015 Annual Meeting of Stockholders.

For the foregoing reasons, a policy that requires an independent chairman is unnecessary and not in the best interests of our stockholders.

Accordingly, the Board of Directors recommends a vote "AGAINST" this proposal.

241. The Company's recommendation presupposes that the Board members are

complying with their oversight responsibilities, including maintaining "the quality and

integrity of our financial statements, [and] our compliance with legal and regulatory requirements."

However, as previously explained, the Board failed in its oversight responsibilities by filing

statements with the SEC and making statements to the public investors that were improper and

misleading.

242. In the 2016 Proxy, defendants solicited stockholder votes to, among other things,

reelect defendants Miller, Schuler, Alutto, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and

Zafirovski to the Board. Defendants Miller, Schuler, Alutto, Bleil, Brown, Chen, Dammeyer,

Hall, Patience, and Zafirovski negligently issued materially misleading statements with respect to

these solicited votes.

243.    In support of reelecting defendants Miller, Schuler, Alutto, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski, the 2016 Proxy claimed that the Audit Committee: (i) fulfills "oversight responsibilities relating to the integrity of our financial statements"; (ii)

"reviews our risk management policies and practices and reports any significant issues to the Board"; and (iii) "recommended … that the Board approve the inclusion of the Company's audited financial statements in the Company's annual report on Form 10-K for the year ended December 31, 2015 for filing with the SEC."

244.    Defendants' statements misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices.  The 2016 Proxy omitted any disclosures that: (i) the Company was engaged in an unlawful practice of increasing customer APIs in violation of contract terms; (ii) the legal action taken against the Company as a result of this unlawful practice was meritorious; (iii) as a result of the scheme, a significant portion of Stericycle's publicly reported revenues and earnings were unlawfully obtained; (iv) the Company lacked adequate disclosure controls and procedures; and (v) as a result, the unlawful activity continued unabated at Stericycle.  The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements.  The Company was reporting inflated earnings and revenues as a result of its unlawful implementation of APIs, and therefore, its financial statements were not appropriate to include in the Company's annual report.  Defendants Miller, Schuler, Alutto, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski were negligent in including these misleading statements in the 2016 Proxy.

245.    The 2016 Proxy harmed Stericycle by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the defendants' misleading statements in the 2016 Proxy, Stericycle's stockholders voted

to elect defendant Bleil and reelect defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer,

Hall, Patience, and Zafirovski.

## INSIDER TRADING DEFENDANTS REAP MILLIONS IN INSIDER SALES

246.    The Insider Trading Defendants used their knowledge of Stericycle's material,

nonpublic information to sell almost $124 million worth of their personal holdings while the

Company's stock was artificially inflated.   As a result, the Insider Trading Defendants personally

benefited from the artificial inflation of Stericycle's stock price caused by their improper statements to investors.

247.    Defendant Miller sold 61% of his holdings—368,461 shares—reaping proceeds over $40.6 million.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 2/8/2013 | 20,000 | $97.60 | $1,952,010.00 |
| 3/5/2013 | 20,000 | $98.13 | $1,962,600.00 |
| 4/29/2013 | 50,000 | $108.20 | $5,410,000.00 |
| 4/30/2013 | 50,000 | $108.07 | $5,403,540.00 |
| 8/12/2013 | 5,547 | $117.54 | $652,011.58 |
| 8/13/2013 | 22,541 | $117.04 | $2,638,207.66 |
| 11/14/2013 | 13,000 | $117.50 | $1,527,451.90 |
| 12/9/2013 | 14,560 | $116.83 | $1,700,973.46 |
| 12/10/2013 | 36,578 | $115.25 | $4,215,475.50 |
| 12/10/2013 | 1,400 | $115.25 | $161,344.68 |
| 10/27/2014 | 23,654 | $122.61 | $2,900,108.13 |
| 10/27/2014 | 16,346 | $122.61 | $2,004,107.87 |
| 11/21/2014 | 788 | $126.98 | $100,060.24 |
| 12/19/2014 | 10,335 | $132.62 | $1,370,627.70 |
| 6/15/2016 | 25,000 | $101.12 | $2,527,947.50 |
| 6/16/2016 | 971 | $102.89 | $99,906.19 |
| 7/1/2016 | 20,000 | $104.55 | $2,091,070.00 |
| 7/1/2016 | 4,665 | $104.55 | $487,742.08 |
| 7/8/2016 | 34,835 | $104.52 | $3,641,055.22 |
| **TOTAL** | **368,461** | | **$40,646,273.27** |

248.    Defendant ten Brink, sold almost 89% of his Stericycle stock for proceeds of over $25 million.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 2/13/2013 | 11,022 | $96.51 | $1,063,745.34 |
| 2/14/2013 | 3,978 | $96.55 | $384,072.32 |
| 4/26/2013 | 18,408 | $108.21 | $1,991,843.16 |
| 4/26/2013 | 3,451 | $108.21 | $373,416.49 |
| 4/26/2013 | 8,141 | $108.21 | $880,899.35 |

| | | | |
|---|---|---|---|
| 8/1/2013 | 38,259 | $116.34 | $4,451,231.88 |
| 8/1/2013 | 100 | $116.34 | $11,634.47 |
| 8/1/2013 | 7,500 | $116.40 | $872,994.00 |
| 10/28/2013 | 139 | $117.02 | $16,265.95 |
| 11/1/2013 | 1,100 | $116.89 | $128,581.31 |
| 11/1/2013 | 4,579 | $116.89 | $535,248.93 |
| 11/4/2013 | 12,595 | $116.58 | $1,468,366.66 |
| 11/5/2013 | 11,587 | $116.48 | $1,349,612.05 |
| 2/11/2014 | 3,027 | $116.08 | $351,360.54 |
| 2/12/2014 | 6,438 | $116.02 | $746,938.05 |
| 2/12/2014 | 737 | $116.02 | $85,506.89 |
| 2/13/2014 | 5,574 | $116.19 | $647,626.34 |
| 2/13/2014 | 4,220 | $116.19 | $490,309.14 |
| 2/14/2014 | 6,780 | $116.17 | $787,606.84 |
| 4/29/2014 | 23,766 | $116.08 | $2,758,726.38 |
| 4/30/2014 | 6,234 | $116.14 | $724,016.76 |
| 7/29/2014 | 30,000 | $118.84 | $3,565,152.00 |
| 7/29/2014 | 15,000 | $118.84 | $1,782,576.00 |
| **TOTAL** | **222,635** | | **$25,467,730.84** |

249.    Defendant Kogler sold 96.79% of his holdings for proceeds of almost $20 million.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 2/13/2013 | 11,600 | $96.52 | $1,119,580.96 |
| 2/14/2013 | 8,400 | $96.55 | $811,012.44 |
| 4/26/2013 | 30,000 | $108.21 | $3,246,159.00 |
| 7/29/2013 | 22,560 | $116.04 | $2,617,918.80 |
| 7/30/2013 | 481 | $115.86 | $55,729.00 |
| 7/30/2013 | 4,718 | $115.86 | $546,630.78 |
| 7/30/2013 | 2,241 | $115.86 | $259,643.83 |
| 8/1/2013 | 5,000 | $116.57 | $582,835.00 |
| 10/28/2013 | 68 | $117.02 | $7,957.44 |
| 11/1/2013 | 2,798 | $116.81 | $326,842.49 |
| 11/4/2013 | 2,432 | $116.58 | $283,530.59 |
| 11/4/2013 | 3,772 | $116.58 | $439,752.21 |
| 11/5/2013 | 5,430 | $116.48 | $632,466.85 |
| 2/11/2014 | 2,851 | $116.08 | $330,931.25 |
| 2/12/2014 | 143 | $116.02 | $16,590.89 |
| 2/12/2014 | 6,614 | $116.02 | $767,357.60 |
| 2/13/2014 | 9,223 | $116.19 | $1,071,592.70 |
| 2/14/2014 | 5,634 | $116.17 | $654,480.37 |
| 2/14/2014 | 101 | $116.17 | $11,732.79 |
| 4/30/2014 | 8,750 | $116.12 | $1,016,006.25 |
| 7/29/2014 | 15,000 | $119.35 | $1,790,206.50 |

| | | | |
|---|---|---|---|
| 10/27/2014 | 4,090 | $123.09 | $503,435.65 |
| 10/27/2014 | 2,400 | $123.09 | $295,414.56 |
| 10/27/2014 | 6,010 | $123.09 | $739,767.29 |
| 10/28/2014 | 12,500 | $123.91 | $1,548,836.25 |
| 10/28/2014 | 1,437 | $123.80 | $177,895.71 |
| **TOTAL** | **174,253** | | **19,845,307.20** |

250.   Defendant Patience sold Stericycle stock worth nearly $13.5 million.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 6/7/2013 | 27,500 | $108.22 | $2,976,050.00 |
| 6/7/2013 | 18,000 | $108.18 | $1,947,240.00 |
| 12/10/2014 | 6,500 | $130.63 | $849,079.40 |
| 12/10/2014 | 3,624 | $130.63 | $473,394.42 |
| 12/10/2014 | 55,000 | $130.77 | $7,192,240.00 |
| **TOTAL** | **110,624** | | **13,438,003.82** |

251.   Defendant Dammeyer sold 81.5% of his holdings between February 2013 and September 2016, where he had sold only 35.2% of his holdings between July 2009 and February 2013, for over $8.6 million.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 8/2/2013 | 390 | $116.77 | $45,539.13 |
| 8/2/2013 | 3,570 | $116.73 | $416,711.82 |
| 8/2/2013 | 150 | $116.78 | $17,517.00 |
| 2/13/2014 | 20,000 | $115.76 | $2,315,100.00 |
| 11/4/2014 | 7,596 | $125.97 | $956,868.12 |
| 11/4/2014 | 568 | $125.97 | $71,550.96 |
| 11/4/2014 | 978 | $125.97 | $123,198.66 |
| 12/30/2014 | 9,500 | $132.60 | $1,259,700.95 |
| 8/5/2015 | 4,000 | $143.49 | $573,952.00 |
| 8/6/2015 | 5,000 | $142.00 | $709,975.00 |
| 8/17/2015 | 3,500 | $146.36 | $512,253.00 |
| 8/18/2015 | 5,000 | $148.20 | $741,005.00 |
| 8/17/2016 | 10,188 | $85.50 | $871,085.21 |
| **TOTAL** | **70,440** | | **8,614,456.85** |

252.   Defendant Alutto sold over 95% of his Stericycle holdings—39,500 shares—for proceeds of $4,668,492.24.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 4/26/2013 | 13,500 | $107.95 | $1,457,334.45 |
| 4/26/2013 | 500 | $107.95 | $53,975.35 |
| 8/18/2014 | 8,162 | $119.29 | $973,609.88 |
| 8/19/2014 | 6,000 | $119.38 | $716,260.80 |
| 8/19/2014 | 2,338 | $119.38 | $279,102.96 |
| 2/12/2015 | 9,000 | $132.02 | $1,188,208.80 |
| TOTAL | 39,500 | | $4,668,492.24 |

253.    Defendant Ginnetti sold 88% of his Stericycle holdings for proceeds of $3,890,361.50.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 10/31/2014 | 5,000 | $125.05 | $625,266.50 |
| 2/17/2015 | 5,000 | $132.86 | $664,314.50 |
| 7/29/2015 | 5,000 | $139.81 | $699,050.50 |
| 2/19/2016 | 6,924 | $110.36 | $764,106.33 |
| 2/22/2016 | 1,076 | $110.88 | $119,306.34 |
| 2/22/2016 | 5,684 | $110.88 | $630,239.08 |
| 2/22/2016 | 3,500 | $110.88 | $388,078.25 |
| TOTAL | 32,184 | | 3,890,361.50 |

254.    Defendant Hall sold over 76% of his Stericycle stock for proceeds of $3,353,506.52.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 7/30/2013 | 10,424 | $115.62 | $1,205,184.31 |
| 7/30/2013 | 2,105 | $115.62 | $243,372.31 |
| 6/10/2014 | 9,433 | $115.69 | $1,091,302.83 |
| 6/10/2014 | 7,033 | $115.69 | $813,647.07 |
| TOTAL | 28,995 | | $3,353,506.52 |

255.    Defendant Arnold sold over 92% of his Stericycle stock for proceeds of over $1.8 million.  Interestingly, he sold no Stericycle stock between 2009 and 2014.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 10/27/2014 | 3,000 | $123.06 | $369,183.90 |
| 10/30/2014 | 1,750 | $123.61 | $216,312.25 |
| 2/17/2015 | 4,000 | $132.91 | $531,622.80 |

| | | | |
|---|---|---|---|
| 7/30/2015 | 5,000 | $139.30 | $696,522.50 |
| **TOTAL** | **13,750** | | **$1,813,641.45** |

256.    Defendant Schuler sold Stericycle stock for proceeds worth over $1 million.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 2/13/2013 | 3,226 | $96.40 | $310,986.40 |
| 2/13/2013 | 3,226 | $96.40 | $310,986.40 |
| 3/25/2013 | 925 | $103.92 | $96,125.72 |
| 3/25/2013 | 955 | $103.94 | $99,259.07 |
| 6/13/2013 | 946 | $105.75 | $100,037.99 |
| 6/13/2013 | 946 | $105.75 | $100,034.86 |
| **TOTAL** | **10,224** | | **$1,017,430.44** |

257.    Defendant Lord sold over 987% of his stock for proceeds of $664,400.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 6/28/2013 | 6,040 | $110.00 | $664,400.00 |
| **TOTAL** | **6,040** | | **$664,400.00** |

258.    Defendant Spaeth sold 100% of his Stericycle stock worth $462,087.60.

| Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|
| 7/30/2013 | 4,000 | $115.52 | $462,087.60 |
| **TOTAL** | **4,000** | | **$462,087.60** |

259.    The timing of defendants' stock sales are extremely suspicious, as many occurred soon after the improper statements touting the health of Stericycle.  In particular, within a week of the April 24, 2013 improper statement, defendants Alutto, Collins, Kogler, ten Brink, and Miller sold 198,200 shares for proceeds of $21,430,927.52.

| | | | | |
|---|---|---|---|---|
| ALUTTO | 4/26/2013 | 13,500 | $107.95 | $1,457,334.45 |
| ALUTTO | 4/26/2013 | 500 | $107.95 | $53,975.35 |
| COLLINS | 4/26/2013 | 12,200 | $108.01 | $1,317,680.52 |
| COLLINS | 4/26/2013 | 12,000 | $108.01 | $1,296,079.20 |
| KOGLER | 4/26/2013 | 30,000 | $108.21 | $3,246,159.00 |
| TEN BRICK | 4/26/2013 | 18,408 | $108.21 | $1,991,843.16 |
| TEN BRICK | 4/26/2013 | 3,451 | $108.21 | $373,416.49 |
| TEN BRICK | 4/26/2013 | 8,141 | $108.21 | $880,899.35 |
| MILLER | 4/29/2013 | 50,000 | $108.20 | $5,410,000.00 |

| | | | | |
|---|---|---|---|---|
| MILLER | 4/30/2013 | 50,000 | $108.07 | $5,403,540.00 |
| | | | | |

260.  Following the Company's July 24, 2013 improper statement, between July 29, 2013 and August 2, 2013, defendants Kogler, Collins, Hall, Spaeth, ten Brink, and Dammeyer sold 131,997 shares for proceeds of $15,334,538.68.

| | | | | |
|---|---|---|---|---|
| KOGLER | 7/29/2013 | 22,560 | $116.04 | $2,617,918.80 |
| COLLINS | 7/30/2013 | 380 | $116.25 | $44,175.00 |
| HALL | 7/30/2013 | 2,105 | $115.62 | $243,372.31 |
| HALL | 7/30/2013 | 10,424 | $115.62 | $1,205,184.31 |
| KOGLER | 7/30/2013 | 481 | $115.86 | $55,729.00 |
| KOGLER | 7/30/2013 | 4,718 | $115.86 | $546,630.78 |
| KOGLER | 7/30/2013 | 2,241 | $115.86 | $259,643.83 |
| SPAETH | 7/30/2013 | 4,000 | $115.52 | $462,087.60 |
| COLLINS | 7/31/2013 | 30,119 | $116.25 | $3,501,333.75 |
| KOGLER | 8/1/2013 | 5,000 | $116.57 | $582,835.00 |
| TEN BRICK | 8/1/2013 | 38,259 | $116.34 | $4,451,231.88 |
| TEN BRICK | 8/1/2013 | 100 | $116.34 | $11,634.47 |
| TEN BRICK | 8/1/2013 | 7,500 | $116.40 | $872,994.00 |
| DAMMEYER | 8/2/2013 | 390 | $116.77 | $45,539.13 |
| DAMMEYER | 8/2/2013 | 3,570 | $116.73 | $416,711.82 |
| DAMMEYER | 8/2/2013 | 150 | $116.78 | $17,517.00 |

261.  In a little over a week following the Company's February 5, 2014 improper statement, defendants Kogler, ten Brink, and Dammeyer sold 71,342 shares for proceeds of $8,277,133.39.

| | | | | |
|---|---|---|---|---|
| KOGLER | 2/11/2014 | 2,851 | $116.08 | $330,931.25 |

| | | | | | |
|---|---|---|---|---|---|
| | TEN BRICK | 2/11/201 4 | 3,027 | $116.0 8 | $351,360.54 |
| | KOGLER | 2/12/201 4 | 143 | $116.0 2 | $16,590.89 |
| | KOGLER | 2/12/201 4 | 6,614 | $116.0 2 | $767,357.60 |
| | TEN BRICK | 2/12/201 4 | 737 | $116.0 2 | $85,506.89 |
| | TEN BRICK | 2/12/201 4 | 6,438 | $116.0 2 | $746,938.05 |
| R | DAMMEYE | 2/13/201 4 | 20,00 0 | $115.7 6 | $2,315,100.0 0 |
| | KOGLER | 2/13/201 4 | 9,223 | $116.1 9 | $1,071,592.7 0 |
| | TEN BRICK | 2/13/201 4 | 4,220 | $116.1 9 | $490,309.14 |
| | TEN BRICK | 2/13/201 4 | 5,574 | $116.1 9 | $647,626.34 |
| | KOGLER | 2/14/201 4 | 5,634 | $116.1 7 | $654,480.37 |
| | KOGLER | 2/14/201 4 | 101 | $116.1 7 | $11,732.79 |
| | TEN BRICK | 2/14/201 4 | 6,780 | $116.1 7 | $787,606.84 |

262.     Five days after the Company's July 24, 2014 improper statement, defendants

Kogler and ten Brink sold 60,000 for proceeds of $7,137,934.50.

| KOGLER | 7/29/2014 | 15,000 | $119.35 | $1,790,206.50 |
| TEN BRICK | 7/29/2014 | 30,000 | $118.84 | $3,565,152.00 |
| TEN BRICK | 7/29/2014 | 15,000 | $118.84 | $1,782,576.00 |

263.    In the week following the Company's October 23, 2014 improper statement, defendants Arnold, Kogler, Miller, and Ginnetti sold 76,187 shares for proceeds of $9,380,328.11.

| ARNOLD | 10/27/2014 | 3,000 | $123.06 | $369,183.90 |
| KOGLER | 10/27/2014 | 4,090 | $123.09 | $503,435.65 |
| KOGLER | 10/27/2014 | 2,400 | $123.09 | $295,414.56 |
| KOGLER | 10/27/2014 | 6,010 | $123.09 | $739,767.29 |
| MILLER | 10/27/2014 | 16,346 | $122.61 | $2,004,107.87 |
| MILLER | 10/27/2014 | 23,654 | $122.61 | $2,900,108.13 |
| KOGLER | 10/28/2014 | 12,500 | $123.91 | $1,548,836.25 |
| KOGLER | 10/28/2014 | 1,437 | $123.80 | $177,895.71 |
| ARNOLD | 10/30/2014 | 1,750 | $123.61 | $216,312.25 |
| GINNETTI | 10/31/2014 | 5,000 | $125.05 | $625,266.50 |

## INDIVIDUAL DEFENDANTS CAUSE STERICYCLE TO REPURCHASE ITS OWN STOCK AT INFLATED PRICES

264.    In breach of their fiduciary duties to Stericycle, and in violation of section 10(b) of the Exchange Act and SEC Rule 10b-5, defendants Miller, Schuler, Alutto, Bleil, Brown, Chen, Dammeyer, Hall, Patience, Zafirovski, Lord, and Spaeth, caused or approved of the Company's repurchase of over 4.5 million shares of its stock at artificially inflated prices.

265.    In 2013, Stericycle paid nearly $164 million to repurchase its stock for an average of $111 per share.  In particular, Stericycle made the following repurchases:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
| --- | --- | --- | --- |
| February 2013 | 74,820 | $95.70 | $7,160,274 |
| March 2013 | - | - | - |
| April 2013 | 84,130 | $107.53 | $9,046,499 |
| May 2013 | 307,038 | $109.55 | $33,636,013 |
| June 2013 | 149,222 | $109.44 | $16,330,856 |
| July 2013 | 166,247 | $115.97 | $19,279,665 |
| August 2013 | 161,517 | $114.83 | $18,546,997 |
| September 2013 | 93,296 | $112.86 | $10,529,387 |
| October 2013 | 220,000 | $116.39 | $25,605,800 |

| | | | |
|---|---|---|---|
| November 2013 | 80,832 | $115.47 | $9,333,671 |
| December 2013 | 123,897 | $114.85 | $14,229,570 |
| Total | 1,460,999 | $111.26 | $163,689,741 |

266.   In 2014, Stericycle paid over $194 million to repurchase its stock for an average

of $117 per share.  In particular, Stericycle made the following repurchases:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| January 2014 | 193,172 | $115.04 | $22,222,507 |
| February 2014 | 406,260 | $114.11 | $46,358,329 |
| March 2014 | 86,558 | $112.72 | $9,756,818 |
| April 2014 | 355,603 | $111.03 | $39,482,601 |
| May 2014 | 171,640 | $112.82 | $19,364,425 |
| June 2014 | - | - | - |
| July 2014 | - | - | - |
| August 2014 | - | - | - |
| September 2014 | 198,728 | $116.60 | $23,171,685 |
| October 2014 | 17,223 | $115.35 | $1,986,673 |
| November 2014 | 47,100 | $126.87 | $5,975,577 |
| December 2014 | 200,251 | $128.56 | $25,744,269 |
| Total | 1,676,533 | $117.01 | $194,062,883 |

267.   In 2015, Stericycle paid over $131.6 million to repurchase its stock for an average

of $130 per share.  In particular, Stericycle made the following repurchases:

| Period | Repurchased Shares | Average Price Per Share | Approximate Aggregate Cost |
|---|---|---|---|
| January 2015 | - | - | - |
| February 2015 | - | - | - |
| March 2015 | 100,713 | $136.74 | $13,771,496 |
| April 2015 | 322,800 | $135.09 | $43,607,052 |
| May 2015 | 131,367 | $133.26 | $17,505,966 |
| June 2015 | 120,640 | $134.93 | $16,277,955 |
| July 2015 | - | - | - |
| August 2015 | 68,729 | $133.37 | $9,166,387 |
| September 2015 | 19,647 | $137.52 | $2,701,855 |
| October 2015 | 45,000 | $117.61 | $5,292,450 |
| November 2015 | 76,907 | $121.96 | $9,379,578 |
| December 2015 | 118,561 | $117.86 | $13,973,599 |
| Total | 1,004,364 | $129.82 | $131,676,339 |

268. Making the timing of the repurchase particularly suspicious, at the same time the Board is causing Stericycle to repurchase Company stock, the Board members themselves, including defendants Miller, Patience, Dammeyer, Alutto, Hall, Schuler, Lord, and Spaeth, are selling their stock on insider information at inflated prices.

## DAMAGES TO STERICYCLE

269.    As a result of the Individual Defendants' improprieties, Stericycle disseminated improper, public statements that omitted or failed to disclose that the Company was engaged in an unlawful scheme to impose unauthorized APIs on their customers in violation of their contract terms. These improper statements have devastated Stericycle's credibility as reflected by the Company's over $5.8 billion, or 46.01% market capitalization loss.

270.    Stericycle's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Stericycle's current and potential customers consider a company's trustworthiness, stability, and ability to accurate describe its business operations.  Customers are less likely to enter into a contract for Stericycle's services if they are unethically violating the terms of those contracts.  Further, myriad litigation by consumers, stockholders, and whistleblowers have exposed Stericycle's unlawful business practices.  Stericycle's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Case, Defendants have materially increased the perceived risks of investing in and lending money to the Company.

271.    As a direct and proximate result of the Individual Defendants' actions, Stericycle has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

a.       costs incurred from defending and paying the Qui Tam Settlement ($29

million);

b.      costs incurred from defending and paying the Consumer Action settlement ($295

million);

c.      costs incurred from defending and paying any settlement or judgment in

the federal securities class action;

d.      costs incurred from any internal investigations:

e.      excessive sums paid to repurchase Company stock; and

f.      costs incurred from compensation and benefits paid to the defendants who

have breached their duties to Stericycle.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

272.    Plaintiff brings this action derivatively in the right and for the benefit of Stericycle

to redress injuries suffered, and to be suffered, by Stericycle as a direct result of violation of

securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well

as the aiding and abetting thereof, by the Individual Defendants.  Stericycle is named as a nominal

defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this

Court that it would not otherwise have.

273.    Plaintiff will adequately and fairly represent the interests of Stericycle in enforcing and

prosecuting its rights.

280.    Plaintiff was a stockholder of Stericycle at the time of the wrongdoing complained

of, has continuously been a stockholder since that time, and is a current Stericycle stockholder.

281.    The current Board of Stericycle consists of the following ten individuals:

defendants Alutto, Miller, Schuler, Patience, Bleil, Dammeyer, Brown, Chen, Hall, and

Zafirovski.  Plaintiff has not made any demand on the present Board to institute this action because

such a demand would be a futile, wasteful, and useless act, as set forth below.

282.     As discussed above, defendants Alutto, Miller, Schuler, Patience, Bleil, Dammeyer, Brown, Chen, Hall, and Zafirovski, the entire Board, directly made the improper statements alleged herein in Stericycle's public filings with the SEC.  These defendants knew or were reckless in not knowing: (a) the Company unilaterally and without notice deliberately increased the billing rates of SQ customer; (b) the Company was deliberately violating customer contracts; (c) The Company's poor customer service significantly lessened the useful life of customer relationships; (d) Stericycle's billing practices of SQ customers was the reason the Company generated positive financial results; (e) as a result, the Company's financial statements were improper; and the Individual Defendants' statements about Stericycle's business, operations, and prospects were improper or lacked a reasonable basis.   In making these improper and misleading statements and omissions of material fact, defendants breached their duties.  Accordingly, all the members of the Board face a substantial likelihood of liability for their breach of fiduciary duties, making any demand upon them is futile

284.     Each member of the Board, defendants Alutto, Miller, Schuler, Patience, Bleil, Dammeyer, Brown, Chen, Hall, and Zafirovski, is a defendant in the Securities Class Action and therefore cannot impartially consider whether to bring this derivative action that will expose themselves and the Company to liability in the Securities class action.  Thus, demand upon them

        is futile.

285.     A majority of the Board, defendants Alutto, Miller, Schuler, Patience, Dammeyer, and Hall, disposed of their personally held Company stock at artificially inflated prices based on their knowledge of material, nonpublic information.   Accordingly, these defendants are both interested in this action and face a substantial likelihood of liability, excusing a demand.

286.     Defendants Alutto, Miller, Schuler, Patience, Bleil, Dammeyer, Brown, Chen, Hall, and Zafirovski breached their fiduciary duties of loyalty by failing to ensure the Company's contracts were executed and carried out pursuant to their terms and applicable law, and failed to comply with

Stericycle's company policies as set forth in its Business Conduct Guidelines and Audit Committee Charter.

287.   Defendants Schuler, Patience, Bleil, Dammeyer, Brown, Chen, and Hall, as members of the Audit Committee, were responsible for:

• "After the completion of the annual audit examination (and before the Company's annual report on Form 10-K is filed with the SEC) … review[ing] with management and the independent accountants: … (7) any major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of the material control deficiencies."

• "[R]eview[ing] and approv[ing] procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal

accounting controls or auditing matters, and for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters."

"[D]iscuss[ing] with management and the independent accountants (i) any significant deficiencies in the design or operation of internal controls and any material weaknesses identified, (ii) any fraud involving management or other employees who have a significant role in the Company's internal controls and (iii) any employee complaints or published reports that raise material issues regarding the Company's accounting, internal accounting controls or auditing matters."

288.   As stated in Stericycle's Corporate Governance Overview, "[t]he Audit Committee reviews our risk management policies and practices and reports any significant issues to the Board. *Matters of risk management are brought to the Committee's attention by our Executive Vice President and Chief Financial Officer, who fills the functional role of our chief risk officer, or by our chief regulatory compliance officer or our principal internal auditor, who focuses on potential weaknesses that could result in a failure of an internal control process*. Our management reviews

and reports on potential areas of risk at the Committee's request or at the request of other members of the Board."  (emphasis added).

289.    Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the wrongdoing alleged above to occur.  The Audit Committee Defendants were well aware of the contract violation allegations that had been asserted against Stericycle in the Qui Tam Complaint and the related class actions, as evidenced by the acknowledgement of these complaints in the Company's public filings made with the SEC from 2013 to the present.

290.    Accordingly, each and every member of the Audit Committee breached their fiduciary duty by allowing or approving the improper statement, allowing or approving the illegal API, and by failing to ensure that the Company's internal controls were effective and efficient and that the Company acted lawfully and ethically in its relationships with its customers.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

291.    Defendants Miller, Schuler, Alutto, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski are responsible for the negligently made statements in the materially misleading Proxies.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  Accordingly, an indemnification provided by the Company to defendants Miller, Schuler, Alutto, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski does not protect them for violations of section 14(a) in the Proxies.  Accordingly, defendants Miller, Schuler, Alutto, Bleil, Brown, Chen, Dammeyer, Hall, Patience, and Zafirovski face substantial likelihood of liability, excusing demand.

292.    Defendants Alutto, Miller, Schuler, Patience, Bleil, Dammeyer, Brown, Chen, Hall, and Zafirovski face a substantial likelihood of liability for violations of section 10(b) of the

Exchange Act and Rule 10b-5 promulgated thereunder for causing Stericycle to repurchase

Case

$530,244,453 in shares of its own common stock at prices that were artificially inflated due to the Individual Defendants' false or misleading statements.

293.   The primary employment of defendant Alutto as Stericycle's President and Chief Executive Offer is as an employee of Stericycle.  Defendant Alutto receives substantial monetary compensation and other benefits from Stericycle.  Defendant Alutto lacks independence from Stericycle due to his interest in maintaining his executive position and is therefore incapable of impartially considering a demand to commence and vigorously prosecute this action against Stericycle.

294.   Defendant Alutto is beholden to defendants Hall, Zafirovski, and Brown, who comprise Stericycle's Compensation Committee and who exert influence over Alutto's compensation.

295.   At the time of the wrongdoing alleged herein, the primary employment of defendant Miller, as Stericycle's Executive Chairman, was as an employee of Stericycle.  He received substantial monetary compensation and other benefits from Stericycle.  Defendant

Miller lacks independence from Stericycle due to his longstanding relationships within the Company and is therefore incapable of impartially considering a demand to commence and vigorously prosecute this action against Stericycle.

296.   Defendants' business relationships are so intertwined they are unable to independently consider whether to sue each other.  Specifically, there is a structural bias within the organization that precludes defendants Patience and Schuler from bringing claims against defendant Miller.  Defendant Patience, through Marquette Venture Partners, L.P., made the initial investment that led to Stericycle's initial capitalization.  Marquette provided $150,000 to back Dr. James W. Sharp, a pathologist who wrote a business plan for a treatment of medical infectious waste using irradiation.  After positive market research, Marquette provided an additional $6.8 million, part of which was invested by R.H. Missner & Co., a Chicago investment company headed by Richard

Missner and defendant Schuler, who was also an unpaid advisor to Marquette.  Defendant Patience, who has been a director since 1989, brought defendant Schuler into the Board in 1990.  Defendant Schuler, who worked with defendant Miller at Abbott Laboratories, brought defendant Miller to Stericycle as a director.  Defendant Miller served as Stericycle's Executive Chairman of the Board from January 2013 to May 2016.  Prior to that, defendant Miller served as Stericycle's Chief Executive Officer.  These three defendants are intertwined as follows:

(a) Defendants Miller, Schuler, and Patience are current directors for Biodesix, Inc., a biotechnology company that discovers and commercializes cancer tests.  Defendants Schuler and Patience have been on the Board since June 2008 and defendant Miller has been on the Board since 2011.

(b)      Defendants Miller, Schuler, and Patience, along with defendants ten Brink and Brown, are current directors for Accelerate Diagnostics, an in vitro diagnostics company looking for solutions for antibiotic resistance and hospital acquired infections.  Defendants Schuler and Patience have served on the Board since June 2012, and defendant Miller has served since March 2013.

(c)      Defendants Miller, Schuler, and Patience, along with defendants Brown and Dammeyer, concurrently served on the board of directors for Ventana Medical Systems, Inc. from July 2004 to February until Ventana was acquired by Roche in 2008.

39.      Defendants Miller and Schuler are also intertwined with defendant ten Brink.

(a)      In 1998, Waste Systems, Inc. ("WSI") became a wholly owned subsidiary of Stericycle.  Defendants Miller and ten Brink concurrently served on the WSI Board.  Further, defendant Miller served as Chief Executive Officer of WSI, while defendant ten Brink served as Vice President of WSI, from at least January 2004 through at least December 2005.

(b)     When Stericycle acquired WSI it indirectly acquired approximately 52.2%

of the outstanding common stock and all the outstanding preferred stock of 3CI ("3CI"), a

regional medical waste management service provider, and 3CI became an indirect majority

owned subsidiary of Stericycle.  In April 2006, Stericycle completed a short-form merger

under

Delaware law and 3CI became a wholly owned subsidiary of Stericycle.  Defendants Miller,

ten Brink, and Schuler concurrently served on the 3CI Board from October 1998 to April 2004.

297.    Defendants Schuler and Patience cofounded private investment firm Crabtree

Partners LLC.

298.    Plaintiff has not made any demand on the other stockholders of Stericycle to institute

this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Stericycle is a publicly held company with over 85.5 million shares

outstanding and thousands of stockholders;

(b)     making demand on such a number of stockholders would be impossible for plaintiff,

who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses,

assuming all stockholders could be individually identified.

**TOLLING OF THE STATUTE OF LIMITATIONS**

299.    Plaintiff had neither actual nor constructive knowledge of the facts constituting

their claims for relief until recently.

300.    Plaintiff did not discover, and could not have discovered through the exercise of

reasonable diligence, the existence of the claims alleged herein until recently, including, most

importantly the requisite *mens rea* of the Individual Defendants for the claims detailed herein.

301.    Upon learning of possible wrongdoing by Company fiduciaries, the plaintiff

diligently pursued his right as a stockholder to inspect Stericycle's books and records under Section

220. The books and records provided by the inspection demand were necessary and essential to determine if and to what extent wrongdoing actually occurred, including the knowledge of the Individual Defendants wrongdoing. Notably, the Company did not finish its production until March 7, 2018.

302. Upon his discovery of this previously concealed wrongdoing found in the course of his Section 220 inspection demand, plaintiff promptly filed this lawsuit within the statutory period. As a result of Stericycle's active concealment, the running of the statute of limitations has been tolled with respect to any claims that plaintiff has as a result of the unlawful conduct alleged in this complaint.

## COUNT I

### Against the Individual Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

303. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

304. During the period of wrongdoing, the Individual Defendants disseminated or approved false or misleading statements about Stericycle, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and defendants' course of conduct artificially inflated the price of the Company's common stock.

305. While the price of the Company's common stock was inflated due to the false and misleading statements made by Individual Defendants, the Director Defendants caused the Company to repurchase shares of its own common stock at prices that were artificially inflated due to defendants' false or misleading statements. Director Defendants engaged in a scheme to defraud Stericycle by causing the Company to repurchase $530,244,453 in shares of Stericycle stock at artificially inflated prices.

306.     Individual Defendants violated section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Stericycle in connection with the Company's purchases of Stericycle's stock during the period of wrongdoing.

307.     Individual Defendants, individually and collectively, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mail: (i) engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; (ii) made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) made the above statements intentionally or with a severely reckless disregard for the truth; and (iv) employed devices, and artifices to defraud in connection with the purchase and sale of Stericycle stock, which were intended to, and did: (a) deceive Stericycle and its stockholders regarding, among other things, Stericycle's unsustainable business model of imposing automatic APIs on SQ clients; (b) artificially inflate and maintain the market price of Stericycle stock; and (c) cause Stericycle to purchase the Company's stock at artificially inflated prices and suffer losses when the true facts became known.  Throughout the period of wrongdoing, defendants were in possession of material, nonpublic information regarding the above.

308.     Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all improper statements made during the period of wrongdoing, as alleged above.

309.     As described above, Individual Defendants acted with scienter throughout the period of wrongdoing, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were

either known to Individual Defendants or were so obvious that defendants should have been aware of them.  Throughout the period of wrongdoing, defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

310.    Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock, both by the Company itself and by the Insider Trading Defendants.

311.    As a result of Individual Defendants' misconduct, Stericycle has and will suffer damages in that it paid artificially inflated prices for its own common stock and suffered losses when the previously undisclosed facts relating to the wrongdoing was disclosed.  Stericycle would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Individual Defendants' false or misleading statements.

312.    As a direct and proximate result of Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Stericycle stock during the period of wrongdoing.  By reason of such conduct, defendants are liable to the Company pursuant to section 10(b) of the Exchange Act and SEC Rule 10b-5.

313.    Plaintiff brings this claim within two years of his discovery of the facts constituting the violation and within five years of the violation.

## COUNT II

**Against Defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Bleil, Hall, Patience, and Zafirovski for Violation of Section 14(a) of the Exchange Act**

315.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein except for those allegations concerning fraud.

316.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Bleil, Hall, Patience, and Zafirovski.  The section

14(a) claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

317.     Defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Bleil, Hall, Patience, and Zafirovski negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the Proxies.  The Proxies contained stockholder proposals to ensure that the Chairman of the Board  be independent. However, defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Bleil,

Hall, Patience, and Zafirovski misrepresented and failed to disclose that: (i) the "strong [financial] performance" that supported the Board's recommendation was misleading and based on the Company's unlawfully imposing APIs on its customers year after year; and (ii) the legal action taken against the Company as a result of this unlawful practice was meritorious; (iii) as a result of the scheme, a significant portion of Stericycle's publicly reported revenues and earnings were unlawfully obtained; (iv) the Company lacked adequate disclosure controls and procedures; and (v) as a result, the unlawful activity continued unabated at Stericycle.

318.     The Proxies also contained proposals to the Company's stockholders that they vote to reelect the members of the Board.  The Proxies, however, misrepresented and failed to disclose and explain that: (i) the Company was engaged in an unlawful practice of increasing customer APIs in violation of contract terms; (ii) the legal action taken against the Company as a result of this unlawful practice was meritorious; (iii) as a result of the scheme, a significant portion of Stericycle's publicly reported revenues and earnings were unlawfully obtained; (iv) the Company lacked adequate disclosure controls and procedures; and (v) as a result, its financial statements were not appropriate to include in the Company's annual report.

319.     By reasons of the conduct alleged herein, defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Bleil, Hall, Patience, and Zafirovski violated section 14(a) of the Exchange Act.

As a direct and proximate result of these violations, stockholders voted in favor of reelecting defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Bleil, Hall, Patience, and Zafirovski to the Board.  Defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Bleil, Hall, Patience, and Zafirovski's reelection led to the continuation of the wrongful actions described herein.

320.    320. Plaintiff, on behalf of Stericycle, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Miller, Schuler, Alutto, Brown, Chen, Dammeyer, Bleil, Hall, Patience, and Zafirovski based upon the false and misleading Proxies, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

## COUNT III

### Against the Individual Defendants for Breach of Fiduciary Duty

321.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

322.    The Individual Defendants owed and owe Stericycle fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Stericycle the highest obligation of good faith, fair dealing, loyalty, and due care.

323.    The Individual Defendants and each of them violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Stericycle, and/or consciously failing to prevent to Company from engaging in the unlawful acts complained of herein.

324.    The Officer Defendants knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants knew, were reckless, or were grossly negligent in not knowing about Stericycle's history of imposing an unlawful, unethical, and systematic 18% API on its customers in violation of its contract terms

and solely for the benefit of lining the pockets of Company executives.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

325.    Director Defendants Alutto, Miller, Schuler, Patience, Bleil, Dammeyer, Brown, Chen, Hall, Zafirovski, Lord, and Spaeth, as directors of the Company, owed Stericycle the highest duty of loyalty.  These defendants breached their duty of loyalty when they recklessly permitted Stericycle executives to violate the Company's own contract terms simply to increase revenue, earnings, and ultimately EBITDA, which enabled Company executives to receive unwarranted bonuses.  Defendants Alutto, Miller, Schuler, Patience, Bleil, Dammeyer, Brown, Chen, Hall, Zafirovski, Lord, and Spaeth knew or were reckless in not knowing that Company executives were violating the Company's own contract terms for their own benefit.  Accordingly, defendants Alutto, Miller, Schuler, Patience, Bleil, Dammeyer, Brown, Chen, Hall, Zafirovski, Lord, and Spaeth breached their duty of loyalty to the Company.

326.    The Audit Committee Defendants, Schuler, Patience, Bleil, Dammeyer, Brown, Chen, and Hall, breached their fiduciary duty of loyalty by approving statements described herein, which were made during their tenure on the Audit Committee.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately handle internal control deficiencies, fraud, and internal complaints regarding these matters, as required by the Audit Committee Charter in effect at the time.

327.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Stericycle has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

328.    Plaintiff, on behalf of Stericycle, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Waste of Corporate Assets

329.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

330.    As a result of the wrongdoing alleged above, over which the Company failed to properly supervise, the Individual Defendants have caused Stericycle to waste its assets by (i) paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty, and (ii) repurchasing Company stock at inflated prices.

331.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

332.    Plaintiff, on behalf of Stericycle, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

333.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

334.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Stericycle.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Stericycle.

335.    Plaintiff, as a stockholder and representative of Stericycle, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

336.    Plaintiff, on behalf of Stericycle, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Stericycle, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Stericycle to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Stericycle and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.      a proposal to strengthen oversight of and compliance with the Company's customer contract;

2.      a provision to control insider selling;

3.      a proposal to strengthen the Company's oversight of stock repurchases;

4.      a proposal to strengthen the Company's controls over financial reporting;

5.      a proposal to strengthen Stericycle's oversight of its disclosure procedures;

6.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

7. a provision to permit the stockholders of Stericycle to nominate at least three candidates for election to the Board.

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust

00540145

on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Stericycle has an effective remedy;

D.      Awarding to Stericycle restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

Dated: April. 16, 2018                          **COOCH AND TAYLOR, P. A.**

                                                /s/ *Blake A. Bennett*
                                                Blake A. Bennett (#5133)
                                                The Brandywine Building
                                                1000 West Street, 10th Floor
                                                P.O. Box 1680
                                                Wilmington, DE 19899
                                                Telephone: (302) 984-3889
                                                FAX (302) 984-3939
                                                E-mail: bbennett@coochtaylor.com
                                                *Attorneys for Plaintiff*

**OF COUNSEL**
Nicholas Koluncich
Law Offices of Nicholas Koluncich, III, LLC
500 Marquette Avenue NW, Suite 1200
Albuquerque, New Mexico 87102
(505) 881-2228
FAX (505) 881-4288
E-mail: nkoluncich@newmexicoclassactions.com
*Attorneys for Plaintiff*